[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-11109
_____

D.C. Docket No. 5:13-cv-00256-MTT

WALKER D. BOWEN,
as administrator of the Estate
of TERRANCE DESMOND BOWEN,

Plaintiff-Appellant,

versus

WARDEN, BALDWIN STATE PRISON,
DOUG UNDERWOOD,
Deputy Warden of Security, Baldwin State Prison,
CAGER EDWARD DAVIS,
Correction Officer, Baldwin State Prison,

Defendants-Appellees,

ANTHONY BROOKINS,
Lieutenant, Baldwin State Prison, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Middle District of Georgia
_____
(June 22, 2016)

Before ED CARNES, Chief Judge, JILL PRYOR and RIPPLE,[*] Circuit Judges.

RIPPLE, Circuit Judge:

On March 9, 2010, Terrance Bowen was beaten to death by his cellmate, Carl Merkerson, at Baldwin State Prison in Milledgeville, Georgia. The administrator of Mr. Bowen's estate brought this action under 42 U.S.C. § 1983, alleging that Mr. Bowen's Eighth Amendment right to be free from cruel and unusual punishment was violated when he was housed in a cell with Merkerson.[1] In his complaint, the administrator named, among others, several prison officials as defendants in their individual capacities. After twice allowing the administrator to amend his complaint, the district court dismissed the action, holding that it did not state Eighth Amendment claims against the prison officials and that, in any event, the officials were entitled to qualified immunity. For the reasons set forth in this opinion, we reverse the judgment of the district court with respect to two of these officials, Deputy Warden Doug Underwood and Corrections Officer Cager Edward Davis, and we remand those claims for further proceedings. In all other respects, we affirm the judgment of the district court.

---

[*] Honorable Kenneth F. Ripple, United States Circuit Judge for the Seventh Circuit, sitting by designation.

[1] "The Eighth Amendment's ban on cruel and unusual punishment is made applicable to the states by virtue of the Fourteenth Amendment." *Carter v. Galloway*, 352 F.3d 1346, 1347 n.1 (11th Cir. 2003) (citing *Robinson v. California*, 370 U.S. 660 (1962)).

# I

# BACKGROUND

## A.[2]

After nearly two years of incarceration for murder, Carl Merkerson was transferred to Baldwin State Prison on February 18, 2010. At all relevant times, Carl Humphrey was the warden of that institution; Doug Underwood was the deputy warden of security; and Cager Edward Davis was the supervising corrections officer of Unit K-3, the unit in which Mr. Bowen was murdered. Collectively, we refer to these three individuals as the "defendant officials."

Merkerson was designated, according to prison guidelines,[3] a Level III mental health inmate. This designation meant that he exhibited "a tenuous mental status that is easily overwhelmed by everyday pressures, demands and frustrations resulting in . . . impulsive behavior, poor judgment, a deterioration of emotional

---

[2] The following factual allegations are taken from the administrator's second amended complaint; we must accept them as true for the purposes of this appeal. *Murphy v. DCI Biologicals Orlando, LLC*, 797 F.3d 1302, 1305 (11th Cir. 2015).

[3] The second amended complaint refers to the two policies at issue—those relating to placement and mental health—only as "the Prison's Placement [G]uidelines" and "[t]he Prison's manual," respectively, R.83 at ¶¶ 10, 21, but does not give any additional context as to the origin or authority of the policies. The defendants, however, refer to the Placement Guidelines as both "GDOC guidelines," R.53-1 at 4, and "Georgia Department of Corrections (GDOC) standard operating procedure (SOP) VG40-0001," R.86-1 at 2. They also refer to the mental health policy as the "GDOC mental health policy." R.86-1 at 12, 16.

3

controls, loosening of associations, delusional thinking and/or hallucinations."[4] Specifically, Merkerson had suffered for several years from severe chronic paranoid schizophrenia. He also experienced auditory hallucinations as well as bizarre and violent delusions involving his cellmates. When his mental condition decompensated, Merkerson became easily agitated and frustrated and was unable to control his impulses or to appreciate the consequences of his actions; he also became violent and dangerous. The defendant officials "were aware of Mr. Merkerson's mental illness"[5]; they "knew that [he] was a Mental Health inmate, Level III."[6]

Merkerson initially was housed in Unit H-2, a unit for Level III mental health inmates. On February 26, 2010, he assaulted his cellmate, John Williams. The resulting disciplinary report characterized Merkerson's conduct as "High-Assault without a weapon."[7] Because of this attack, and due to his status as a mental health inmate, the prison's "Placement Guidelines" required that Merkerson be housed alone unless "the demands of a specific situation require[d] a

---

[4] R.83 at ¶ 21 (emphases omitted).

[5] *Id.* at ¶ 90.

[6] *Id.* at ¶ 22.

[7] *Id.* at ¶¶ 26–27.

4

placement contrary to the Placement Guideline[s]."[8]  The defendant officials "knew that Mr. Merkerson, pursuant to the Placement Guideline[s], had to be 'housed' alone."[9]  After the assault, Merkerson was transferred from Unit H-2 to a single occupancy cell in Unit K-3, "the lock-down segregation unit for disciplinary, protected custody and mental health individuals."[10]

On or around March 2, 2010, Merkerson's mother called the prison and spoke with Merkerson's mental health counselor, Pat Tyler.  She told Tyler that her son's "mental health condition was decompensating," that "when [his] mental health decompensates, [he] becomes violent and dangerous," and that he "needed to be isolated from other inmates, so that he would not hurt anyone."[11]  Merkerson's mother was told that Merkerson would be isolated.  Deputy Warden Underwood and Officer Davis knew Tyler and knew that he was Merkerson's counselor.  However, the complaint does not allege specifically that any of the defendant officials knew about the phone call from Merkerson's mother.

Merkerson remained alone in his cell in Unit K-3 until March 7, 2010, when Terrance Bowen, also a mental health inmate, was placed in the cell with him.

---

[8] *Id.* at ¶¶ 13–15.

[9] *Id.* at ¶ 32.

[10] *Id.* at ¶¶ 28, 35–36.

[11] *Id.* at ¶¶ 128–30.

"There was no specific situation justifying" the housing of Mr. Bowen with Merkerson.[12]  Mr. Bowen apparently could have been housed in Unit H-2, the unit for mental health inmates.[13]  Nevertheless, Merkerson and Mr. Bowen were housed together in the same cell because Warden Humphrey had "instituted a policy of double-celling inmates."[14]

Merkerson was six inches taller than Mr. Bowen and outweighed him by nearly one hundred pounds.  The defendant officials knew of this size disparity.  The cell in which the two men were housed was small, measuring twelve feet by eight feet, with solid cinder-block walls and a concrete floor.  The cell's door was solid with a small window.  The inside of the cell was not visible from the outside unless the flap that covered the window, which was kept closed, was lifted.  The cell also was not equipped with an alarm.  Both Deputy Warden Underwood and Officer Davis were familiar with the layout of the cell.

On March 8, 2010, the night before he was murdered, Mr. Bowen asked to be removed from the cell "because of Mr. Merkerson," but the request was denied

---

[12] *Id.* at ¶ 46.

[13] As mentioned earlier, according to the complaint, Unit H-2 is a unit for mental health inmates.  Unit K-3 is "the lock-down segregation unit for disciplinary, protected custody and mental health individuals." *Id.* at ¶ 36.

[14] *Id.* at ¶¶ 145, 149.

6

"because of [Warden] Humphrey's double-celling policy."[15] The administrator does not allege specifically that Mr. Bowen asked to be moved because Merkerson had threatened him or that Mr. Bowen feared for his safety if he remained in the cell, nor does the administrator allege that any of the defendant officials knew about Mr. Bowen's request.

A large population chart in the unit office identified the inmates in each cell, stated the crime for which each inmate was incarcerated, stated why each inmate was in the unit, and stated whether the inmate was a mental health inmate. Attached to the outside of each cell door was a "segregation/isolation checklist," which indicated each inmate's mental health status, the unit from which they had been transferred, and the reason they had been transferred.[16] At 10:47 a.m. on March 9, 2010, the morning of Mr. Bowen's murder, Deputy Warden Underwood inspected the cell and saw the two men together inside. Deputy Warden Underwood knew from the cell's checklist that Merkerson was a mental health inmate, that he had been convicted of murder and that he was in the cell for assaulting another inmate. He had also seen the population chart in the unit office. That same morning, Officer Davis, who had also observed Mr. Bowen in the cell with Merkerson, signed the checklist outside the cell door. From the checklist,

---

[15] *Id.* at ¶¶ 151–54.

[16] *Id.* at ¶¶ 64–67.

Officer Davis knew that Merkerson was a mental health inmate who had been transferred to Unit K-3 from Unit H-2 and that he had recently assaulted another inmate. Officer Davis also read the population chart in the unit office on the morning of Mr. Bowen's murder.

Prison officials later discovered Mr. Bowen with his head stuffed in the cell's toilet and his body limp, brutally beaten, and unmoving. Merkerson had his hands around Mr. Bowen's neck and was pressing his knee against Mr. Bowen's back. Mr. Bowen was transported to the Medical Center of Central Georgia, where he died a few hours later from injuries caused by the beating.

## B.

On July 19, 2013, the administrator of Mr. Bowen's estate brought this action under 42 U.S.C. § 1983 in the United States District Court for the Middle District of Georgia. The administrator alleged that Mr. Bowen's Eighth Amendment right was violated when he was housed in the cell with Merkerson, and he named as individual defendants Warden Humphrey, Deputy Warden Underwood, Officer Davis, and Rex Schoolcraft, a psychiatrist contracted by the prison.[17] On September 13, 2013, Dr. Schoolcraft moved to dismiss the claim

---

[17] The initial complaint also named Lieutenant Anthony Brookins as a defendant, but Lieutenant Brookins was not included as a defendant in the second amended complaint.

8

against him, and the district court denied the motion.[18]  In a separate motion to dismiss, the defendant officials—Warden Humphrey, Deputy Warden Underwood, and Officer Davis—contended that the administrator had failed to state any claims under the Eighth Amendment and that they were entitled to qualified immunity. The district court then allowed the administrator to conduct limited discovery and amend his complaint.  The defendant officials again moved to dismiss.

After a second discovery period, and with leave of the court, the administrator filed his second amended complaint, and the defendant officials moved to dismiss for a third time, raising the same arguments they had raised in their two previous motions.  With respect to the Eighth Amendment claims against Deputy Warden Underwood and Officer Davis, the defendant officials argued that the administrator had not made the necessary showing that either official subjectively knew of a serious risk of harm to Mr. Bowen.  They also asserted that the administrator had failed to state a supervisory claim against Warden Humphrey.  Finally, the three defendant officials maintained that they were entitled to qualified immunity because they were acting within their discretionary authority and their conduct was not in violation of clearly established law.

---

[18] The administrator's case against Dr. Schoolcraft is ongoing.  Dr. Schoolcraft has since moved for summary judgment, and, according to the record before us, the motion is pending before the district court.

9

The district court granted the motion and dismissed all of the administrator's claims. In the court's view, the claims against Deputy Warden Underwood and Officer Davis failed because the administrator "ha[d] not sufficiently alleged facts to state a plausible claim that either Underwood or Davis was subjectively aware that Merkerson posed a substantial risk of serious harm to Bowen."[19] It held, therefore, that both men were entitled to qualified immunity. The court also dismissed the administrator's supervisory claim against Warden Humphrey, explaining that the administrator had failed to "allege that Humphrey knew or even should have known that his double-celling policy had resulted in constitutional violations" and concluding, therefore, that Warden Humphrey also was entitled to qualified immunity.[20]

The administrator timely appeals the dismissal of the claims against Deputy Warden Underwood and Officer Davis. The administrator does not, however, challenge the dismissal of the supervisory claim against Warden Humphrey, and so we do not address that claim.

## II

## DISCUSSION

---

[19] R.93 at 10.

[20] *Id.* at 13.

We review the district court's dismissal of the administrator's claims de novo, accepting the allegations in the second amended complaint as true and construing them in the light most favorable to the administrator. *Murphy v. DCI Biologicals Orlando, LLC*, 797 F.3d 1302, 1305 (11th Cir. 2015).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). It is established law in this circuit that "the *Twombly-Iqbal* plausibility standard" applies equally to "[p]leadings for § 1983 cases involving defendants who are able to assert qualified immunity as a defense." *Randall v. Scott*, 610 F.3d 701, 707 n.2, 709 (11th Cir. 2010); *see also Hoefling v. City of Miami*, 811 F.3d 1271, 1276 (11th Cir. 2016) (reaffirming holding of *Randall*).

## A.

Deputy Warden Underwood and Officer Davis maintain that they are entitled to the protections of qualified immunity. "To receive qualified immunity, [a] government official must first prove that he was acting within his discretionary authority." *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014) (internal quotation marks omitted). The administrator does not dispute that the defendant officials have made this showing. Consequently, the burden now

11

rests on the administrator to establish that Deputy Warden Underwood and Officer Davis are "not entitled to qualified immunity by showing that the facts alleged make out a violation of a constitutional right and that the constitutional right was clearly established at the time of [the] conduct." *Perez v. Suszczynski*, 809 F.3d 1213, 1218 (11th Cir. 2016). We therefore must consider two questions: (1) "whether, taken in the light most favorable to the [administrator], the facts alleged show [Deputy Warden Underwood and Officer Davis's] conduct violated a constitutional right," and, (2) if so, "whether the right was clearly established." *Id.* (internal quotation marks omitted).

We first consider whether the facts alleged in the second amended complaint make out a violation of the Eighth Amendment. "It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 31 (1993). Beyond just restraining prison officials from inflicting "cruel and unusual punishments" upon inmates, "[t]he Amendment also imposes duties on these officials, who must . . . 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). To this end, the Supreme Court has made clear that "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Id.* at 833 (alteration in

12

original) (internal quotation marks omitted); *see also Zatler v. Wainwright*, 802 F.2d 397, 400 (11th Cir. 1986) ("[I]t is well settled that a prison inmate has a constitutional right to be protected . . . from physical assault by other inmates.").

Deliberate indifference in the context of a failure to prevent harm has a subjective and an objective component, i.e., a plaintiff must show both "that the defendant actually (subjectively) kn[ew] that an inmate [faced] a substantial risk of serious harm" and "that the defendant disregard[ed] that known risk by failing to respond to it in an (objectively) reasonable manner." *Caldwell*, 748 F.3d at 1099 (alterations in original) (internal quotation marks omitted). Not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834. Rather, a prison official violates the Eighth Amendment in this context only "when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not respond reasonably to the risk." *Caldwell*, 748 F.3d at 1099 (emphasis omitted) (internal quotation marks omitted). Accordingly, to state an Eighth Amendment claim premised on a failure to prevent harm, a plaintiff must allege facts showing that: (1) a substantial risk of serious harm existed; (2) the defendants were deliberately indifferent to that risk, i.e., they both subjectively knew of the risk and also disregarded it by failing to respond in

13

an objectively reasonable manner; and (3) there was a causal connection between the defendants' conduct and the Eighth Amendment violation.  *See id.*

In the district court, the defendant officials moved three times to dismiss the various iterations of the administrator's complaint, each time asserting that Deputy Warden Underwood and Officer Davis were entitled to qualified immunity on two grounds:  (1) that the administrator had failed to make the necessary showing that either was subjectively aware of a substantial risk of harm to Mr. Bowen, and (2) that even if he had, preexisting law at the time did not clearly establish that their failure to act violated the Eighth Amendment.  In their briefs to this court, the parties have focused their arguments on the same issues. Accordingly, at this point in the proceedings, we will also focus our Eighth Amendment inquiry on those issues,[21] but we do not mean to imply that the defendants may not raise other issues and make additional arguments as the facts are developed.  *See Oladeinde v. City of Birmingham*, 230 F.3d 1275, 1289 (11th Cir. 2000) (explaining that defendants are "not precluded from asserting the qualified immunity defense throughout the proceedings as the facts develop[]").

---

[21] *See Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1100 (11th Cir. 2014) (limiting analysis to subjective component of deliberate indifference element where defendants did not dispute remaining elements of plaintiff's claim); *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 620 (11th Cir. 2007) ("Because it is not necessary for us to do so, we decline to address the objective component of Rodriguez's Eighth Amendment claim.").

In the district court's view, the administrator did not plead sufficient facts showing that Deputy Warden Underwood and Officer Davis subjectively knew of the substantial risk posed to Mr. Bowen by allowing him to be housed in a cell with Merkerson. We find ourselves in respectful disagreement with that assessment. A prison official possesses actual, subjective knowledge of a substantial risk when the official is "both . . . aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . also draw[s] the inference." *Farmer*, 511 U.S. at 837. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Id.* at 842. The trier of fact may, therefore, "conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* Nevertheless, it is only a heightened degree of culpability that will satisfy the subjective knowledge component of the deliberate indifference standard, a requirement that "is far more onerous than normal tort-based standards of conduct sounding in negligence." *Goodman v. Kimbrough*, 718 F.3d 1325, 1332 (11th Cir. 2013).

We begin by setting out fully and precisely what, according to the complaint, Deputy Warden Underwood and Officer Davis allegedly knew at the time they failed to take action. Setting aside any conclusory legal allegations, the

15

second amended complaint alleges that these two defendants knew: (1) that Merkerson had been convicted of murder; (2) that Merkerson was a severe paranoid schizophrenic who suffered from auditory hallucinations and violent delusions involving his cellmates; (3) that Merkerson could become impulsive and dangerous if his mental condition decompensated; (4) that Merkerson was designated by the prison as a Level III mental health inmate, meaning he exhibited "a tenuous mental status that is easily overwhelmed by everyday pressures, demands and frustrations resulting in . . . impulsive behavior, poor judgment, a deterioration of emotional controls, loosening of associations, delusional thinking and/or hallucinations"[22]; (5) that, according to the population chart and the cell checklist, Merkerson had been transferred from Unit H-2 to Unit K-3, the segregation unit, for assaulting his previous cellmate; (6) that the prison's "Placement Guideline[s]" required mental health inmates who had committed an assault to be housed alone[23]; (7) that Mr. Bowen was being housed in the cell with Merkerson in contradiction to the Guidelines' requirement; (8) that Merkerson was significantly larger than Mr. Bowen; and (9) that the cell that the two inmates shared was small, not observable from the outside unless the window flap was lifted, and not equipped with an alarm.

---

[22] R.83 at ¶ 21 (emphases omitted).

[23] *Id.* at ¶ 32.

Deputy Warden Underwood and Officer Davis's primary contention is that these factual allegations show, at most, that they possessed only a generalized awareness of Merkerson's problematic nature, a level of culpability we have held insufficient to "satisfy the subjective awareness requirement." *Carter v. Galloway*, 352 F.3d 1346, 1350 (11th Cir. 2003). In *Carter*, John Carter was placed, over his objection, in a cell with fellow inmate Termayne Barnes, "a close-security, Level 5 inmate." *Id.* at 1348. Barnes informed Carter that he intended to fake a hanging in order to obtain a transfer, and when Carter refused to assist Barnes in this endeavor, Barnes told Carter that he would help him "one way or another." *Id.* In addition to this verbal exchange, Barnes also "paced the cell like a caged animal" and "generally act[ed] in a disorderly manner." *Id.* (internal quotation marks omitted). Carter relayed this information to prison officials in an attempt to be removed from the cell he shared with Barnes, but no action was taken. *Id.* Roughly one week later, Barnes stabbed Carter in the stomach with a shank. *Id.* Carter then brought claims against the prison officials alleging that they had violated the Eighth Amendment by allowing him to remain in the cell with Barnes, and the district court dismissed the claims on summary judgment. *Id.*

On appeal, we acknowledged that the prison officials were aware that "Barnes was a problem inmate with a well-documented history of prison disobedience and had been prone to violence" and that he was "acting crazy" and

17

pacing his cell.  *Id.* at 1349 (internal quotation marks omitted).  Nevertheless, we explained that "before [a defendant's] awareness arises to a sufficient level of culpability, there must be much more than mere awareness of [an inmate's] generally problematic nature."  *Id.*  Although the prison officials possessed a "generalized awareness" of "Barnes's propensity for being a problematic inmate," without knowledge "of a particularized threat or fear," we could not conclude that the officials actually drew the inference that Barnes posed a substantial risk of serious harm to Carter.  *Id.* at 1350.  We therefore affirmed the district court's grant of summary judgment in favor of the prison officials.

At this stage of the proceedings, the administrator's factual allegations, taken as true, render his claims materially distinguishable from those in *Carter*.  According to the second amended complaint, Deputy Warden Underwood and Officer Davis were not merely aware of Merkerson's "generally problematic nature."  *Id.* at 1349.  Rather, they knew *specifically* that he had committed a "High-Assault" against his previous cellmate and that the assault had precipitated his transfer and segregation in Unit K-3.[24]  Far from a generalized awareness of Merkerson's propensity to misbehave, this allegation indicates a degree of specificity in the risk of harm posed to Mr. Bowen that simply was not present in

---

[24] *Id.* at ¶¶ 14, 27–28, 35–36.

*Carter*.  *See Rodriguez*, 508 F.3d at 621–22 (distinguishing *Carter* based on the specificity of the information concerning the risk of harm provided by the inmate to the defendant prison official); *see also Farmer*, 511 U.S. at 842–43 (noting that subjective knowledge may exist where a risk was "expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it").  Furthermore, it is clear from the pleadings that Merkerson was not merely "acting crazy."  *Carter*, 352 F.3d at 1349.  Deputy Warden Underwood and Officer Davis allegedly understood the volatile and dangerous nature of Merkerson's mental condition.  Both officials knew that Merkerson was a severe paranoid schizophrenic who suffered from violent delusions, auditory hallucinations, and impulsive tendencies.  And if either official harbored any doubts concerning the validity of Merkerson's illness, they should have been quelled by the knowledge of his designation as a Level III mental health inmate.  For these reasons, our decision in *Carter* involved an appreciably different set of circumstances and cannot control our decision today.

Far more relevant to the present case is *Cottone v. Jenne*, 326 F.3d 1352 (11th Cir. 2003).  In *Cottone*, Peter Cottone Jr. was arrested and eventually "transferred from the Broward County Jail to Unit 1 of the North Broward Detention Center, which houses mentally ill inmates." *Id.* at 1355.  Around the

19

same time, Widnel Charles also was arrested.  *Id.*  Prior to his arrest, Charles had been detained "on numerous occasions due to his violent tendencies and a history of schizophrenia," and "[w]hile in the booking area of the Broward County Jail . . . , Charles [had] struck another inmate."  *Id.* at 1355–56.  Several days later, Charles also was transferred to the North Broward Detention Center.  *Id.* at 1356.  Roughly a month after that, a staff psychiatrist determined that Charles was mentally stable, resulting in his placement in Unit 1 with Cottone and another inmate.  *Id.*  Although Unit 1 was divided into three separate cells, the cell doors were not locked, which allowed the three men to interact.  *Id.*  The following day, "[d]uring a schizophrenic episode, Charles allegedly strangled Cottone with shoelaces."  *Id.*  Cottone was transported to the North Broward Medical Center where he later died.  *Id.*

On behalf of the estate, Cottone's father brought claims against the prison officials under § 1983, alleging that their "reckless indifference toward a substantial risk of serious inmate harm" had violated Cottone's Eighth Amendment right.  *Id.*[25]  The district court denied the prison officials' motion to dismiss,

---

[25] The factual basis for the claim in *Cottone* occurred while Cottone was a pretrial detainee.  "[T]he relevant constitutional guarantee [therefore was] not the Eighth Amendment's prohibition against cruel and unusual punishment, but rather the Due Process Clause of the Fourteenth Amendment."  *Cottone v. Jenne*, 326 F.3d 1352, 1356 n.4 (11th Cir. 2003).  Nevertheless, we noted that, given the nature of Cottone's claim, our analysis was the same under either Amendment.  *Id.*

concluding that they were not entitled to qualified immunity, and the officials filed an interlocutory appeal. *Id.* at 1357.  Affirming the district court's decision, we explained that there was evidence that the prison officials were subjectively aware of the substantial risk posed by Charles to other inmates because:  (1) they were assigned to Unit 1 and therefore "knew they were monitoring mentally ill inmates, who were so mentally ill that they had been assessed, classified, and separated for housing in Unit 1"; and (2) "they were aware of the substantial risk of serious harm that Charles individually posed to other inmates based on his violent, schizophrenic outbursts which occurred prior to the murder incident."  *Id.* at 1358.

Our decision in *Cottone* controls the present case.  Like the prison officials in *Cottone*, Deputy Warden Underwood and Officer Davis allegedly knew from the population chart and the cell checklist that Merkerson, a convicted murderer, was designated a Level III mental health inmate who had been transferred to Unit K-3, "the lock-down segregation unit for disciplinary, protected custody and mental health individuals," after assaulting his former cellmate.[26]  They also allegedly were aware of the specifics of Merkerson's severe paranoid schizophrenia, his delusions, and his violent impulses.  Having personally seen Mr. Bowen in the cell with Merkerson prior to the murder, both defendant officials

---

[26] R.83 at ¶¶ 28, 36.

21

would have known that such double celling violated the Placement Guidelines' requirement that mental health inmates like Merkerson be housed alone.[27] Moreover, unlike in *Cottone*, there is no indication in the pleadings here that Merkerson's mental stability was ever reassessed.  There was no question that he was unstable.

The defendant officials do not discuss *Cottone*.  Instead, they contend that dismissal is appropriate because the administrator failed to make direct, explicit allegations either (1) that Deputy Warden Underwood or Officer Davis knew that, the night before his murder, Mr. Bowen had requested that he be removed from the cell "because of Mr. Merkerson,"[28] or (2) that these defendants were aware of Merkerson's mother's warning the week before to Pat Tyler, the prison mental health counselor, that her son's mental state was decompensating.  For several reasons, we decline to take such a parsimonious view of the administrator's complaint.

---

[27] We recognize that "failure to follow procedures does not, by itself, rise to the level of deliberate indifference." *Taylor v. Adams*, 221 F.3d 1254, 1259 (11th Cir. 2000).  It may still be relevant to the extent that it shows subjective awareness of a substantial risk. *See Hott v. Hennepin Cty., Minn.*, 260 F.3d 901, 906–07 (8th Cir. 2001); *Williams v. Benjamin*, 77 F.3d 756, 766 & n.5 (4th Cir. 1996).  But more than just a failure to follow procedure has been alleged in the present case.  That allegation is coupled with the allegations that the defendant officials knew about Merkerson's severe and documented mental illness, his violent behavior, and his recent assault on a cellmate, and it is those allegations together that form the basis for the claim.  At the motion to dismiss stage, that is enough.

[28] R.83 at ¶¶ 151–52.

As an initial matter, the Supreme Court has made clear that knowledge of an inmate's specific request to be moved based on a particular threat is not necessary to state a failure-to-protect claim under the Eighth Amendment, as subjective knowledge may be established "by reliance on any relevant evidence." *Farmer*, 511 U.S. at 848 (explaining that "the failure [of an inmate] to give advance notice [of a risk of harm] is not dispositive"); *see also Hale v. Tallapoosa Cty.*, 50 F.3d 1579, 1583 (11th Cir. 1995) (same). In any event, the absence of these specific allegations "does not diminish the reasonable inferences drawn from the" considerable factual matter alleged in the second amended complaint. *Caldwell*, 748 F.3d at 1101. According to the administrator, Deputy Warden Underwood and Officer Davis *knew* the troubling details of Merkerson's severe mental condition; they *knew* of his recent assault against his cellmate; and they *knew* that, under the Placement Guidelines, he should have been housed alone.

These are not assertions of mere negligence or even gross negligence,[29] nor are they mere recitations of the legal elements of the administrator's Eighth

---

[29] *Cf. Goodman v. Kimbrough*, 718 F.3d 1325, 1334 (11th Cir. 2013) (affirming summary judgment against plaintiff where defendants failed to conduct head counts or cell checks and deactivated emergency call buttons because such evidence of negligence did "not relieve Goodman of the burden of showing that the officers were subjectively aware of the risk").

Amendment claim.[30]  On the contrary, the administrator alleges that Deputy Warden Underwood and Officer Davis were *actually aware* of a substantial and seemingly conspicuous risk posed to Mr. Bowen by allowing him to remain in the small cell with Merkerson.  *See Farmer*, 511 U.S. at 842 (explaining that subjective knowledge can be inferred from circumstantial evidence and "the very fact that the risk was obvious").  Even assuming that these defendant officials were unaware of Mr. Bowen's removal request or Merkerson's mother's warning, this lack of awareness does not serve to negate or even to discount the facts they allegedly did know.

We conclude, therefore, that the administrator has set forth in his second amended complaint sufficient facts showing that Deputy Warden Underwood and Officer Davis were both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and . . . also dr[e]w the inference." *Id.* at 837.  Because this was the sole disputed element of his claims against these defendants, dismissal was inappropriate.

## B.

Although the administrator has made the necessary showing, on the face of the complaint, that Mr. Bowen's Eighth Amendment right was violated, "qualified

---

[30] *Cf. Franklin v. Curry*, 738 F.3d 1246, 1251 (11th Cir. 2013) (reversing denial of motion to dismiss where plaintiff's complaint consisted mainly of "conclusory legal allegations" lacking factual support).

24

immunity will still attach unless that right was clearly established at the time"

Deputy Warden Underwood and Officer Davis failed to act. *Perez*, 809 F.3d at

1221. "In determining whether a right is clearly established, the relevant,

dispositive inquiry is 'whether it would be clear to a reasonable officer that his

conduct was unlawful in the situation he confronted.'" *Caldwell*, 748 F.3d at 1102

(quoting *Cottone*, 326 F.3d at 1359). Thus, the "salient question" is whether,

looking to the decisions of the Supreme Court, the Eleventh Circuit, and the

Georgia Supreme Court, "the state of the law in" March 2010 gave Deputy Warden

Underwood and Officer Davis "fair warning" that their conduct was unlawful.

*Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *McClish v. Nugent*, 483 F.3d 1231, 1237

(11th Cir. 2007). We conclude that it did.

Given the nature of the pleadings before us and the allegations that the

conduct at issue occurred in 2010, our discussion and reiteration of 2003 *Cottone*

circuit precedent in the 2014 decision in *Caldwell v. Warden, FCI Talladega*, 748

F.3d 1090 (11th Cir. 2014), is dispositive. In *Caldwell*, addressing the clearly

established prong of qualified immunity, we explained that our 2003 decision in

*Cottone* had "held that the total failure to monitor or supervise a visibly violent,

mentally unstable, schizophrenic inmate who was housed in a separate unit for

mentally ill inmates and who posed a substantial risk of serious harm to other

inmates in that housing unit constituted deliberate indifference" in violation of the

25

Eighth Amendment. *Caldwell*, 748 F.3d at 1102 (citing *Cottone*, 326 F.3d at 1358–59). As we have discussed in detail above, the record in this case is materially indistinguishable from the circumstances present in *Cottone*. Deputy Warden Underwood and Officer Davis were therefore on notice in March 2010 that "the law of this Circuit, as expressed in *Cottone*, clearly established that the defendants' total failure to investigate—or take any other action to mitigate—the substantial risk of serious harm that [Merkerson] posed to [Mr. Bowen] constituted unconstitutional deliberate indifference to [Mr. Bowen's] Eighth Amendment rights." *Id.* at 1103. These defendants therefore are not entitled to qualified immunity at this stage of the proceedings.

We emphasize that the claims against Deputy Warden Underwood and Officer Davis were dismissed on the pleadings and that in our analysis we have taken the administrator's factual allegations as true and construed them in his favor. This case may look very different as it moves beyond the pleadings and the record is developed more fully. *See Oladeinde*, 230 F.3d at 1289 (explaining that the "defendants [are] not precluded from asserting the qualified immunity defense throughout the proceedings as the facts develop[]"). Nevertheless, at this stage and on the pleadings alone, Deputy Warden Underwood and Officer Davis are not entitled to the protections of qualified immunity.

## Conclusion

26

Because we conclude that Deputy Warden Underwood and Officer Davis are not entitled to qualified immunity, we reverse the judgment of the district court and remand the case for further proceedings.  In all other respects, we affirm the decision of the district court.  The administrator may recover his costs in this court.

AFFIRMED in part, REVERSED and REMANDED in part.