[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-14631
_____

D.C. Docket No. 1:15-cv-00029-LJA-TQL

TOMMY L. MOSLEY, JR.,

Plaintiff-Appellant,

versus

LT. TOWANDA ZACHERY, et al.

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(July 24, 2020)

Before WILLIAM PRYOR, Chief Judge, JILL PRYOR and LUCK, Circuit Judges.

LUCK, Circuit Judge:

"The Eighth Amendment," the Supreme Court has told us, "imposes a duty

on prison officials 'to protect prisoners from violence at the hands of other

prisoners.'"[1]  "A prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Eighth Amendment."[2]  "An Eighth Amendment violation will occur when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not 'respond[] reasonably to the risk.'"[3]

Prisoner Tommy Mosley told prison official Lt. Towanda Zachery that prisoner Shaun Taylor threatened to kill him.  The issue here is whether the only reasonable response, when Lt. Zachery heard about the threat, was immediately to place Mosley in protective custody.  We hold that it was not.  The reasonableness of a prison official's response to a substantial risk of serious harm depends on the facts the official knew when she learned about the threat.  Sometimes, the facts are so serious and clear that anything less than immediate protective custody for the threatened prisoner would be unreasonable.  More often, as here, the prison official responds reasonably by taking the time to investigate the threat and look into different options all while making sure the prisoners are being supervised.  Because we agree with the district court that, viewing the summary judgment evidence in the light most favorable to Mosley, Lt. Zachery reasonably responded to Taylor's threat

---

[1]  Rodriguez v. Sec'y for Dep't of Corrs., 508 F.3d 611, 616–17 (11th Cir. 2007) (quoting Farmer v. Brennan, 511 U.S. 825, 833 (1994)).

[2]  Marsh v. Butler Cty., 268 F.3d 1014, 1028 (11th Cir. 2001) (en banc), abrogated on other grounds by Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).

[3]  Id. (alteration in original) (quoting Farmer, 511 U.S. at 844).

2

(even if the harm was ultimately not averted), we affirm the summary judgment for Lt. Zachery on Mosley's Eighth Amendment failure-to-protect claim.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In early August 2014, during a search of his prison cell, Taylor refused to allow a corrections officer to confiscate what appeared to be a cellular telephone.[4] Taylor asked another inmate in his dorm, Mosley, to write in a statement that Taylor had a radio and not a cellphone. Even though Mosley's cell was on another floor and he didn't see what happened in Taylor's cell, he provided a written statement. But the statement wasn't what Taylor wanted. Mosley wrote that he did not see Taylor with a cellphone or radio. Taylor didn't know until later what Mosley put in his statement, and Mosley didn't tell Taylor what he wrote.

About two weeks later, on August 22, 2014, at around 7:00 a.m., Taylor had his disciplinary hearing based on what happened during the search of his cell. Lt. Zachery was the presiding officer. No other inmate, aside from Taylor, was at the hearing or testified. Mosley's statement was read aloud. At the end of the hearing, Lt. Zachery found Taylor guilty for failing to follow instructions and obstructing the search, but not guilty for possessing the cellphone. Taylor, according

---

[4] Because Lt. Zachery moved for summary judgment, we view the summary judgment evidence in the light most favorable to Mosley. See Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1092 (11th Cir. 2014) ("Because the [prison officials] moved for summary judgment, we present the facts in the light most favorable to plaintiff Caldwell, construing all reasonable inferences in his favor.").

3

to Lt. Zachery, "did not appear angry or upset" or make any "threats as to the physical safety of . . . Mosley or any other [Autry State Prison] inmates or personnel" but, instead, merely "inquired into the possibility of appealing" the decision.

After the hearing, at around 9:30 a.m., Taylor entered Mosley's cell, woke him up, quoted his statement from the hearing, accused him of snitching, and threatened to kill him. Grayson Taylor, a prisoner two cells down from Mosley's cell, heard the threat.[5] But nothing happened. Mosley asked Taylor to leave his cell, and Taylor did.

At around 11:00 a.m., Mosley and another inmate, Robert Leonard, were on their way to "pill call" when they saw Lt. Zachery in front of the central control station of the dorm. They told Lt. Zachery that Taylor threatened Mosley's life because Taylor believed Mosley snitched on him, "caused [Taylor] to get found guilty," and hurt Taylor's chances of being paroled. Mosley wanted Lt. Zachery's protection. Lt. Zachery told Mosley that "if [Taylor] puts a hand on you, I got your back" and that she "would look into" moving Taylor. Lt. Zachery said that prison officials were already thinking about moving Taylor from the honors dorm (the

---

[5] Mosley's response to Lt. Zachery's motion for summary judgment included two "declarations" by fellow prisoners Grayson Taylor (not related to Shaun Taylor) and Robert Leonard. The district court did not consider the Taylor and Leonard declarations as part of the summary judgment evidence because they did not comply with 28 U.S.C. § 1746. Mosley argues that this was error, and we assume (without deciding) that it was. We will consider the Taylor and Leonard declarations as part of our review of the summary judgment evidence in the light most favorable to Mosley.

"good behavior dorm" at Autry State Prison) because Taylor and his prison counselor were having disagreements.  In the meantime, Lt. Zachery told Mosley to return to his cell as he was already late for count time.  Mosley said that "if I got to go back to the dormitory how are you going to have my back up here and I've got to [go] back to the dormitory and deal with this inmate?"  Lt. Zachery promised Mosley that she would "look into it."  Mosley, as directed, went back to his cell for count time.

A few words about count time.  Count time is "a routine but important security measure" used by the Georgia Department of Corrections at least five times a day to "ensure around-the-clock accountability of inmates."  Prison officials count the prisoners to verify that the count "reconcile[s]" with the master count of the prison population.  During count time, "[t]here [is] no movement of inmates," and prisoners have to "remain locked or under close supervision in the area in which they were counted until the count is clear."  Under the department's count-time policy, prisoners are counted while "stand[ing] at attention by their bunks or cell doors" or in designated count time areas.  To guarantee that every inmate is accounted for, "an officer [must] allow nothing short of an emergency to distract his/her attention" until the count is completed.  Autry State Prison strictly adhered to the department's count-time policy.  On August 22, 2014, Lt. Zachery was the shift supervisor and

had overall responsibility for the count. Her job was to receive and verify all counts as they were reported from the various housing units.

"[M]oments" after Mosley reported the threat, Taylor pulled Mosley into his cell, shut the door, and assaulted him. The prison's design allows a prisoner to close and lock his door. But once a door is locked, the prisoner cannot unlock it by himself. To unlock a door, the prisoner must press a button that notifies a prison official to come and open the door. Trapped inside the cell, Taylor bit Mosley and hit him on the head with a lock. The attack, a prison doctor found, "resulted in only superficial wounds to [Mosley's] head and shoulders." Specifically, he had bite wounds on his shoulders and lacerations on his head. For his injuries, Mosley was given ointment for the wounds, a shot for the bite marks, and Tylenol for the general pain.

Mosley sued Lt. Zachery under 42 U.S.C. § 1983, alleging that she was deliberately indifferent to Taylor's threat and, therefore, violated his Eighth Amendment right to be free from cruel and unusual punishments.[6] Lt. Zachery moved for summary judgment, arguing that there was no evidence she was

---

[6] Mosley sued two other defendants—Warden Edward Philbin and Assistant Warden Benjamin Nobles. By the summary judgment phase, Mosley still retained his failure-to-protect claim against Lt. Zachery and his request for injunctive relief against Philbin and Nobles, which sought to compel Philbin and Nobles to transfer Taylor out of Autry State Prison. Philbin and Nobles moved to dismiss Mosley's request as moot because Taylor had been transferred to a different prison. The district court, on the magistrate judge's recommendation, granted summary judgment on other grounds. Mosley has not appealed the ruling on his request for injunctive relief.

6

deliberately indifferent to Taylor's threat and that she was entitled to qualified immunity. The magistrate judge recommended granting Lt. Zachery's motion. Reviewing the summary judgment evidence, the magistrate judge concluded that, although "the evidence show[ed] that [Lt. Zachery] had a subjective knowledge of a risk of harm to [Mosley]," the evidence also demonstrated that she "responded reasonably to the risk, even if the harm ultimately was not averted."[7] The district court, over Mosley's objection, adopted the magistrate judge's recommendation, and Mosley now appeals.

## STANDARD OF REVIEW

We review de novo a district court's grant of summary judgment. Rodriguez, 508 F.3d at 616. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## DISCUSSION

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. The Supreme Court has read these words to impose a duty on prison officials to "take reasonable measures to guarantee the safety of the inmates." Farmer, 511 U.S. at 832 (quoting Hudson v. Palmer, 468

---

[7] Because the magistrate judge recommended granting Lt. Zachery's summary judgment motion because she reasonably responded to Taylor's threat, he did not reach Lt. Zachery's alternative argument that she was entitled to qualified immunity.

7

U.S. 517, 526–27 (1984)).  That duty, the Supreme Court has held, includes "protect[ing] prisoners from violence at the hands of other prisoners."  Id. at 833 (quotation omitted).

"[A] prison official violates the Eighth Amendment only when two requirements are met."  Id. at 834.  First, "[f]or a claim (like the one here) based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm."  Id.  Second, "[t]o violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind."  Id. (quotation omitted).  "In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety . . . ."  Id. (quotation omitted).  "To survive summary judgment on a deliberate indifference failure-to-protect claim, 'a plaintiff must produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendant['s] deliberate indifference to that risk; and (3) causation.'"  Caldwell, 748 F.3d at 1099 (quoting Goodman v. Kimbrough, 718 F.3d 1325, 1331 (11th Cir. 2013)).  Here, the district court granted Lt. Zachery's summary judgment motion on the deliberate-indifference element.

Deliberate indifference "has two components:  one subjective and one objective."  Id.  "[A] plaintiff must show both that the defendant actually (subjectively) kn[ew] that an inmate [faced] a substantial risk of serious harm and that the defendant disregard[ed] that known risk by failing to respond to it in an

8

(objectively) reasonable manner." Bowen v. Warden, Baldwin State Prison, 826 F.3d 1312, 1320 (11th Cir. 2016) (alterations in original; quotation omitted). "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Farmer, 511 U.S. at 844. The district court granted Lt. Zachery's summary judgment motion on the objective component of the deliberate-indifference element, adopting the magistrate judge's conclusion that Lt. Zachery responded reasonably after hearing about the threat.

Mosley contends that we should reverse the summary judgment on the objective component because "Lt. Zachery's failure to respond by immediately segregating Mosley from his attacker was unreasonable." Lt. Zachery, Mosley says, "should have placed [him] in protective custody until she was sure the threat had abated." Mosley contends that if a prisoner says he is in fear for his life, the prison official must place the prisoner in protective custody until an investigation is completed. Anything less, Mosley argues, is objectively unreasonable.

We rejected a prisoner's similar argument in Marbury v. Warden, 936 F.3d 1227 (11th Cir. 2019). See id. at 1236 ("We have . . . upheld dismissal of or summary judgment against deliberate-indifference claims where, although a plaintiff told prison officials about a threat by another inmate or inmates, the prison officials were not deliberately indifferent to a substantial risk of harm. . . . Successful deliberate-

indifference claims will generally require some further reason[s]—beyond the plaintiff having informed the defendant officers of the threat—that a prison official could have concluded that a particular threat evidenced a substantial threat, rather than the mere possibility, of serious harm."); see also id. at 1237 ("Marbury's argument is essentially that every prisoner who tells prison officials about an unspecified threat from an unspecified inmate without more is entitled to protective custody or a transfer. But . . . our caselaw establishes a higher standard for deliberate indifference."). The reasonableness of a prison official's response to a threat does not rise or fall on Mosley's all-or-nothing, one-size-fits-all approach.

The Supreme Court, instead, has explained that whether a prison official is deliberately indifferent is judged—both objectively and subjectively—on the facts the prison official knew at the time she responded to the risk of harm to the prisoner. See Farmer, 511 U.S. at 837 ("We hold . . . that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). In some cases, a prison official is going to be aware of facts that would make it unreasonable to respond in any manner other than immediately placing a threatened prisoner in protective custody. If, say, a prisoner came running

10

to a corrections official as the prisoner was being chased by his shiv-wielding cellmate who was yelling, "I will kill you," and the official knew the cellmate had a history of stabbing other prisoners, it may be unreasonable for the official to tell the prisoner, "I've got your back," "We're looking into moving your cellmate," and "Go back to your cell." In most other cases, based on what the prison official knows about the prisoners, their history, the threat, and the structure and administration of the prison, it is not an unreasonable response to see that the prisoners are separated and supervised while the official investigates the threat and looks into her options.

In deliberate-indifference cases, as in life, context matters. See Youmans v. Gagnon, 626 F.3d 557, 564 (11th Cir. 2010) (stating that "the threshold of deliberate indifference is connected to combinations of diverse interdependent factual elements"); Jordan v. Doe, 38 F.3d 1559, 1564 (11th Cir. 1994) (determining that "[t]he objective component of an Eighth Amendment claim is . . . contextual" (quotation omitted)). Here, the facts (viewed in the light most favorable to Mosley) show that Lt. Zachery did not respond in an unreasonable manner when she told Mosley she had his back, would investigate the threat, and would look into moving Taylor, and had him return to his separate, lockable cell for the highly-regulated count time.[8]

_____

[8] Because we agree with the district court that Lt. Zachery reasonably responded to the threat, and was therefore entitled to summary judgment on the objective prong of the deliberate-indifference standard, we do not address the other issues raised by the parties: whether Lt. Zachery

The disciplinary hearing. Taylor was not upset or agitated when Mosley's written statement was read at the disciplinary hearing. Mosley's statement—that he did not know whether Taylor had a radio or cellphone in his cell—was related only to the cellphone charge against Taylor, and Lt. Zachery found Taylor not guilty of that charge. Lt. Zachery found Taylor guilty of two other charges—interfering with a search and failing to follow instructions—and Mosley's written statement had nothing to do with those charges.

After the hearing. After Taylor was found not guilty of the cellphone charge but guilty of the other two charges, he was not upset or angry. Taylor only asked about the process for appealing Lt. Zachery's decision.

Taylor was in the honors dorm. Taylor and Mosley were housed in the honors dorm. The honors dorm was "[b]asically" the "good behavior dorm" at Autry State Prison. The prisoners in the honors dorm didn't "get in too much trouble" and had "minimal" behavioral issues. Lt. Zachery mentioned to Mosley that they were thinking about moving Taylor out of the honors dorm, but that was because Taylor was having issues with his counselor.

---

was subjectively aware of a substantial risk of serious harm (the subjective prong of the deliberate-indifference standard); and whether she was entitled to qualified immunity. See Rodriguez, 508 F.3d at 620 ("Because it is not necessary for us to do so, we decline to address the objective component of Rodriguez's Eighth Amendment claim."). We also do not address the other two elements of Mosley's Eighth Amendment failure-to-protect claim: substantial risk of serious harm and causation.

12

Cells in the honors dorm. Honors dorm inmates at Autry State Prison shared their cell with a cellmate. Mosley and Taylor were not cellmates. Mosley's cell was on the floor above Taylor's. The cells at Autry State Prison lock from the inside. A prisoner, once inside his cell, can lock it so no one else can come in. The cell can only be unlocked by prison officials.

The threat. Mosley reported to Lt. Zachery that Taylor threatened to kill him because Taylor thought Mosley was a snitch. But Mosley was untouched as he went to "pill call" and found Lt. Zachery in front of the central control station.

Timing of the threat. Mosley reported Taylor's threat to Lt. Zachery at around 11:00 a.m.—four hours or so after the morning disciplinary hearing.

Count time. After assuring Mosley that she had his back and that she would look into moving Taylor, Lt. Zachery told Mosley to go back to his cell so he would be there for count time. During count time, prisoners were "required to stand at attention by their bunks or cell doors." There is "no movement of inmates during an official count." Prisoners must "remain locked or under close supervision in the area in which they were counted until the count is clear."

Lt. Zachery was the shift supervisor. On August 22, 2014, the day of the attack, Lt. Zachery was the shift supervisor for Autry State Prison. The shift supervisor has a number of responsibilities during count time. The shift supervisor must: "ensure that staff under his/her supervision know and understand the counting

13

procedures"; "verify that all count records are accurate"; "receiv[e] all counts as they are called in from the various housing units and work assignments"; and "record[] the numbers on the Official Count Form and verify[] the results with the inmate supervisor." The shift supervisor "take[s] the count, by telephone, from each area of the facility where inmates are housed or at work. As each area reports its count, the supervisor will so indicate on the Official Count Sheet."

Timing of the attack. There was very little time between Mosley's report to Lt. Zachery and the attack. According to fellow prisoner Robert Leonard, Taylor attacked Mosley "moments" after Lt. Zachery told Mosley to go back to his cell for count time.

* * * *

Lt. Zachery was available to talk with Mosley about the threat and told him she had his back, would investigate the threat, and would look into moving Taylor. This was a reasonable response given what Lt. Zachery knew about Taylor and Mosley and the history of their dispute. Lt. Zachery found Taylor not guilty of the cellphone charge, which was the only charge that related to Mosley's written statement. Mosley's statement could not and did not support the cellphone charge, and his statement had nothing to do with the other two charges. Taylor was not upset during the hearing when Mosley's statement was read, and he was not upset after the hearing. Taylor was not so upset that he immediately acted on his threat. Taylor

14

was in the "good behavior dorm" along with other inmates that didn't "get in too much trouble."

Lt. Zachery, in addition to having Mosley's back, promising to investigate the threat, and looking into moving Taylor, also had Mosley return to his cell for count time. This too was reasonable because Mosley and Taylor were not cellmates and their cells were on different floors of the honors dorm. During the thirty-minute count time, they would be supervised as they stood at attention by their cells and would not be allowed to move. After count time, Mosley would be able to lock himself in his separate cell from the inside.

Finally, we cannot say that it was unreasonable for Lt. Zachery, as the shift supervisor, to follow prison policy and finish the 11:00 a.m.–12:30 p.m. official count. "The administration of a prison," the Supreme Court has said, "is at best an extraordinarily difficult undertaking." Hudson v. Palmer, 468 U.S. 517, 527 (1984) (quotation omitted). Because of the extraordinary difficulty in running a prison, "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Bell v. Wolfish, 441 U.S. 520, 547 (1979) (emphasis added). "Such considerations are peculiarly within the province and professional expertise of corrections officials, and

15

. . . courts should ordinarily defer to their expert judgment in such matters." Id. at 547–48 (quotation omitted).

Count time was an "important security measure that establishe[d] an accurate system of census checks to ensure around-the-clock accountability of inmates." The count time procedures "mandate[d] that while count [was] being conducted 'an officer will allow nothing short of an emergency to distract his/her attention' until the count has been verified." In the extremely difficult undertaking of running Autry State Prison, we owe deference to Lt. Zachery's judgment call to execute prison policies, ensure institutional safety for prisoners, staff, and visitors, and supervise the count time.

We find support for our conclusion that Lt. Zachery reasonably responded to the threat from the few cases where we've found that a prison official did not respond in a reasonable manner to a substantial risk of serious harm to a prisoner. In Marsh v. Butler County, 268 F.3d 1014 (11th Cir. 2001) (en banc), four inmates at an Alabama county jail assaulted one of the plaintiffs in his cell. Id. at 1025. The plaintiff "was struck in the head with a metal pipe, beaten for several minutes, and cut with a screwdriver." Id. A second plaintiff was attacked by the same four inmates the next day. Id. The second plaintiff was "attacked in the dayroom," and "was hit in the head with a metal pipe and hit with a watercooler. His head was smashed into a table, and he was kicked, stomped, stabbed and beaten for 30 minutes

16

to an hour." Id. at 1026. The next day, one of the four inmates nearly suffocated the first plaintiff, who was still recovering from his earlier injuries. Id. at 1025.

The plaintiffs sued the sheriff alleging that her "deliberate indifference to the unreasonably dangerous conditions at the Jail deprived [them] of their Eighth Amendment and Fourteenth Amendment rights under the United States Constitution." Id. at 1024. The plaintiffs alleged that at the county jail:

> 1) there was no segregation of nonviolent inmates from violent inmates, pretrial detainees from convicted criminals, juveniles from adults, or inmates with mental disorders from those without mental disorders, 2) at times the Jail housed more prisoners than the cells could accommodate, 3) the Jail was routinely understaffed, 4) no head counts of prisoners were made to make sure they were all accounted for, 5) locks on cell doors were not functional, allowing inmates to roam freely at all hours of the day, 6) homemade weapons were readily available by fashioning weapons from material torn from the dilapidated structure of the Jail, 7) no lock down of prisoners in their cells occurred at any point during the day or night, 8) cells were not visually inspected, 9) no jailer was assigned to maintain prisoners' security on the second floor where most of the inmates were housed, 10) the Jail was not operated in accordance with written policies, 11) inmates were not screened for mental health, medical conditions or conflicts with other prisoners before entering the Jail, and 12) prisoners were not disciplined or segregated when they attempted to escape, threatened jailers, destroyed property or assaulted other inmates.

Id. at 1029. "[T]hese alleged conditions, if true," we said, "present[ed] an objectively substantial risk of serious harm—including the risk of inmate-on-inmate attacks—to inmates." Id.

The plaintiffs alleged that the sheriff knew, and had been warned, about the substantial risk of serious harm at the county jail.

17

In August 1995, the jail inspector for the Alabama Department of Corrections recommended that all Butler County jailers be trained in jail-management seminars. By the time of the incidents underlying the complaint, few jailers had been so trained. Written procedures did not govern the Jail's operations. . . .

Jail Administrator Thelma Teague ("Teague") told the Sheriff several times that the Jail needed more staff. In February 1996, the jail inspector for the Alabama Department of Corrections informed Defendants that the Jail was not reasonably secure. Defendants also received many complaints and requests for assistance from prisoners. A letter from prisoner-rights advocates told Defendants that the Jail conditions posed "an immediate and serious threat to the safety of the inmates" and made inmates "highly vulnerable to assault by other inmates."

Id. at 1025. The plaintiffs alleged that the sheriff, knowing all this, "did absolutely nothing to alleviate the conditions at the Jail, despite repeated warnings and recommendations for how conditions could be improved." Id. at 1029. "This alleged lack of action," we concluded, was "not reasonable under the alleged circumstances." Id.

The prison conditions for Mosley were much different. Unlike the Marsh county jail, Mosley was separated and placed with other "good behavior" prisoners. The prison did head counts at least five times a day to make sure all prisoners were accounted for. The prison cells locked. The prison cells were visually inspected. The prison strictly followed its written policies on accounting for prisoners. And prisoners were disciplined if they violated prison rules.

Lt. Zachery, also unlike the sheriff in Marsh, did not do "absolutely nothing" in response to Taylor's threat. Lt. Zachery was available to talk to Mosley and told

18

him she would have his back and would look into moving Taylor out of the honors dorm. Lt. Zachery sent Mosley to the safety of count time, where he would be separated from Taylor because each prisoner would have to stand in front of his cell (and Mosley and Taylor did not share a cell and were on different floors). Mosley could then lock himself in his cell away from Taylor. The Marsh plaintiffs didn't have these reasonable options to stay safe. See 268 F.3d at 1029 ("[N]o head counts of prisoners were made to make sure they were all accounted for," and "locks on cell doors were not functional, allowing inmates to roam freely at all hours of the day.").

In Cottone v. Jenne, 326 F.3d 1352 (11th Cir. 2003), the decedent was strangled to death by another inmate who "had a history of violent outbursts and mental instability and was in the midst of a violent schizophrenic outrage prior to his murdering" the decedent. Id. at 1356, 1358. "Given his visibly violent, mentally unstable state," we said, the inmate "posed an objective risk of serious harm to other inmates, including" the decedent. Id. at 1358.

The decedent's estate sued the two corrections officers who were on duty the night of the murder, alleging that their "reckless indifference toward a substantial risk of serious inmate harm . . . , which led to [the decedent's] death, violated the Eighth Amendment's prohibition against cruel and unusual punishment." Id. at 1356. The estate alleged that the officers "knew they were monitoring mentally ill inmates, who were so mentally ill that they had been assessed, classified, and

19

separated for housing." Id. at 1358.  Despite there being surveillance cameras in the cell block,  the officers were not "monitoring the inmates at all during the time either of [the inmate's] violent schizophrenic outburst prior to the murder or of [the inmate's] murder of" the decedent. Id. at 1356, 1358–59.  Instead, the estate alleged the officers "took consecutive breaks during this time and . . . a computer game was observed on the computer screen at their monitoring station at the time of the murder." Id. at 1359.  The officers' "response to the risk" posed by the "visibly violent, mentally unstable" inmate, we concluded, "was objectively unreasonable." Id. at 1358.

Lt. Zachery's response was far different than the officers in Cottone.  Unlike the Cottone officers, Lt. Zachery put Mosley in a highly monitored environment in the prison—count time—after hearing about the threat.  The count-time policy required that prison officials "remain in the area counted until the count ha[d] been verified."  During count time, there was to be "no movement of inmates" and "inmates [were to] remain locked or under close supervision in the area in which they were counted until the count [was] clear."

And unlike the Cottone officers, Lt. Zachery was not on a smoke break or playing solitaire on her computer in response to the threat.  She was not doing nothing.  Lt. Zachery made herself available to talk with Mosley about Taylor's threat, said she would have Mosley's back, agreed to look into moving Taylor from

20

the honors dorm, and had him separated and supervised as part of the prison-wide count.

"Not 'every injury suffered by one prisoner at the hands of another . . . translates into a constitutional liability for prison officials responsible for the victim's safety.'" Bowen, 826 F.3d at 1320 (omission in original) (quoting Farmer, 511 U.S. at 834). Prison officials are not constitutionally liable for their negligent, and even civilly reckless, violations of a prisoner's Eighth Amendment rights. See Farmer, 511 U.S. at 835, 837 ("[D]eliberate indifference describes a state of mind more blameworthy than negligence. . . . [P]etitioner asks us to define deliberate indifference as what we have called civil-law recklessness, and respondents urge us to adopt an approach consistent with recklessness in the criminal law. We reject petitioner's invitation . . . ." (footnotes omitted)). "Rather, a prison official violates the Eighth Amendment in this context only when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not respond reasonably to the risk." Bowen, 826 F.3d at 1320 (quotation omitted). Given what Lt. Zachery knew about Taylor's disciplinary hearing, his demeanor after he was found not guilty of the cellphone charge, his honors dorm status, the location of his cell in relation to Mosley's, and the fact that Mosley informed her of the threat during count time, Lt. Zachery reasonably responded where she made herself available to hear about the threat, told Mosley that she had his back and would look into moving

21

Taylor, and sent Mosley to his separate, lockable cell to be closely supervised during the count time.

## CONCLUSION

Having reviewed, in the light most favorable to Mosley, what Lt. Zachery knew when she heard about the threat, we agree with the district court that Lt. Zachery did not respond in an unreasonable manner. Because Mosley has not met one of the essential elements of his failure-to-protect Eighth Amendment claim, we affirm the summary judgment for Lt. Zachery.

**AFFIRMED.**