[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-14205

_____

JERRY NELSON,
as Personal Representative of the Estate
of deceased Eddie Lee Nelson, Jr.,
MICHELE DUSHANE,
as surviving spouse of Eddie Lee Nelson, Jr.,

Plaintiffs-Appellees,

*versus*

DONNA TOMPKINS,
TROY CULPEPPER,
LIEUTENANT LARRY MITCHELL,
GLENDA HALL,
SGT. ALFREDO TORRES, et al.,

2                    Opinion of the Court                    22-14205

Defendants,

C.O. KEYVON SELLERS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia
D.C. Docket No. 4:20-cv-00213-CDL

_____

Before WILLIAM PRYOR, Chief Judge, and ABUDU and ED CARNES, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This interlocutory appeal involves the constitutional obligation of jailers to protect foreseeable victims from violent detainees. After watching news reports of white police officers shooting black men, Jayvon Hatchett decided that "somebody has to do something." So he walked into an AutoZone store and stabbed a white store clerk. When he arrived at the county jail on charges of aggravated assault, Hatchett told intake officer Keyvon Sellers that the police shootings inspired him to stab a white man, but Sellers failed to tell other officers of that confession. Classification officers, unaware of Hatchett's motivation for racial violence, assigned

Hatchett to a shared cell with a white man, Eddie Nelson, whom Hatchett later strangled to death. Nelson's survivors sued Sellers for deliberate indifference to a substantial risk of serious harm in violation of the Fourteenth Amendment. *See* 42 U.S.C. § 1983. The district court denied Sellers's motion for summary judgment based on qualified immunity. Because a reasonable jury could find that Sellers violated Nelson's clearly established constitutional right by failing to protect him from a known risk of harm, we affirm.

## I. BACKGROUND

On August 25, 2020, Jayvon Hatchett, a black man, walked into an AutoZone store in Columbus, Georgia, posing as an interested shopper. When the white store clerk turned his back, Hatchett stabbed him multiple times with a knife. Columbus police officers arrested Hatchett the next day on charges of aggravated assault and possession of a weapon during the commission of a crime. Hatchett's arrest warrant and arrest report stated that Hatchett "did assault . . . with a deadly weapon one Michael Hunt" but made no mention of the victim's race or the motive for the assault.

After the arrest, transportation officer Antonio Burgess drove Hatchett to the Muscogee County Jail. When they arrived at the jail, Hatchett told Burgess that he stabbed the store clerk because he saw a video of cops killing black people. Intake officer Keyvon Sellers was not present during that conversation and did not overhear any of those statements. Hatchett also told the nurse who performed his intake medical screening that he stabbed the store clerk because he was "just upset" and felt that "somebody has

4                    Opinion of the Court                    22-14205

to do something." Sellers was not present during that conversation either. And the nurse did not tell anyone about it because she believed intake nurses were not "supposed to know" why a detainee was in jail.

The first time that Sellers heard anything about why Hatchett had stabbed the store clerk was after the medical screening. Burgess accompanied Hatchett to the booking area to meet with Sellers for intake processing. Sellers gave Hatchett a pat down without incident. Then, surveillance footage captured Burgess tell Hatchett, "Go on, tell him what you said to me. Tell him what you did." Hatchett smirked and mumbled something about "see[ing] a video" of cops killing black men and "decid[ing] [he] was gonna stab a white guy." Burgess jumped in and added, "So he went to the AutoZone and stabbed a white man in the back." Sellers said nothing in response, but he shook his head in apparent disapproval. Burgess removed Hatchett's handcuffs without incident. Burgess later told investigators that he made a point to tell Sellers what Hatchett admitted because the information was not included in the arrest report and he "felt that some precautions needed to be taken." Sellers interpreted Hatchett's statement to him to mean that Hatchett had "seen all the white cops killin' black people, so [he] wanted to stab a white guy"—"[n]o particular white guy"—and that he stabbed the store clerk "because he was white."

Sellers failed to tell any jail employees what he knew about Hatchett's racial motive. He testified that if he had thought Hatchett posed a risk of harm to others, he would have notified a

classification officer charged with inmate housing assignments. Sellers explained that classification officers are ordinarily receptive to these suggestions: "they'll move" an inmate if given "a good reason." But Sellers testified that he did not view Hatchett as "a potential threat" to anyone and that Hatchett was polite and cooperative during their interactions.

The survivors submitted an expert report disputing Sellers's testimony that he was unaware of Hatchett's risk to other inmates. The expert determined, based on the record and his own extensive experience in police management and training, that "Sellers had direct knowledge of the risk Hatchett posed to a white person" and "should have notified someone" of that risk. The expert testified that Sellers's contrary assertion was "perplexing" because the facts Sellers knew about Hatchett's crime made it "obvious" that Hatchett posed "a threat to white inmates."

Hatchett's last stop before detention was with the jail's classification officers, who assigned inmates cells based on a detailed procedure. An officer would first review the detainee's arrest report and criminal history. Then, the officer would ask the detainee a list of standard questions, including whether the detainee was an assault risk and whether he should be isolated from anyone. These form questions did not inquire about the motive for the detainee's alleged crime or whether he had racial prejudices. Using this information, the classification officer would designate the detainee as requiring minimum, medium, or maximum security. Detainees charged with aggravated assault were assigned a maximum-

6                     Opinion of the Court                  22-14205

security classification. The classification officer would assign the detainee an appropriate cell based on his security classification and any other relevant information. After the classification process was complete, an intake officer would escort the inmate to his assigned cell.

Hatchett met with two classification officers on the day of his arrest, but neither learned of the racial motive for his assault. One officer completed a portion of Hatchett's classification paperwork, asked him the standard interview questions, and assigned him a maximum-security classification because of his aggravated assault charge. The other officer finished Hatchett's classification paperwork, though she never met with him. The form the officers completed neither flagged Hatchett as an "Assault Risk" nor specified that he should be "Separated" from any other inmates. Both classification officers testified that had someone told them the details of Hatchett's assault, they would not have housed him with a white cellmate.

On August 26, officers assigned Hatchett to cell 3E6, where he joined inmate Rae Nolan, a white man. Eddie Nelson—another white inmate and Hatchett's victim—joined Hatchett and Nolan the next day. Nolan told investigators after Nelson's death that Hatchett had told his white roommates that he was in jail because he stabbed "the first white guy he s[aw]" after watching a "cop shooting video[]" that "pissed him off." But Nolan otherwise described Hatchett as "real quiet" and said there was no tension between the three cellmates. The three men lived together without

reported incident until August 31, when Nolan was transferred to a different cell. The next day, inmate Clifford Sheppard, a black man, joined Hatchett and Nelson in 3E6. The men were housed together without incident until September 4, when Sheppard was relocated, leaving Hatchett and Nelson alone in 3E6.

Early on the morning of September 5, an officer found Hatchett strangling Nelson in their shared cell. The officer ordered Hatchett to stop, but Hatchett refused, exclaiming, "He put a hair in my sandwich." Backup officers arrived and immediately moved Hatchett to an isolated cell. Nelson was pronounced dead at the scene.

Hatchett completed a psychological evaluation later that day. The accompanying doctor's note explained that Hatchett "[s]tates he is here for aggravated assault. Mentioned about his roommate talking about racial things. Vague about the sequence of events occurred between the two. Later the incident occurred." The record contains no other evidence of violence or threatened violence between Hatchett and Nelson during their eight days as cellmates.

Nelson's brother, as the representative of Nelson's estate, and Nelson's spouse sued Sellers for deliberate indifference to a substantial risk of serious harm to Nelson in violation of the Fourteenth Amendment. Nelson's survivors also asserted state and federal claims against other officials and their employers, but those defendants are not parties to this appeal.

Sellers moved for summary judgment. He argued that the survivors' constitutional claim failed as a matter of law and that he was entitled to qualified immunity. The district court denied Sellers's motion. It determined that a reasonable jury could find that Sellers violated Nelson's clearly established constitutional right.

## II. STANDARDS OF REVIEW

"We review our own jurisdiction *de novo*." *Tillis ex rel. Wuenschel v. Brown*, 12 F.4th 1291, 1296 (11th Cir. 2021). We also review a denial of qualified immunity *de novo* and, on a motion for summary judgment, view the evidence in the light most favorable to the nonmoving party. *Id.*

## III. DISCUSSION

We divide our discussion into three parts. First, we explain that we have jurisdiction to review this denial of qualified immunity. Second, we explain that the evidence viewed in the light most favorable to the survivors could lead a reasonable jury to find that Sellers violated Nelson's constitutional right. Third, we explain that Nelson's right was clearly established when Sellers's challenged conduct occurred.

### A.  *We Have Jurisdiction to Decide This Interlocutory Appeal.*

"Whether we have interlocutory jurisdiction to review the denial of summary judgment on qualified immunity grounds depends on the type of issues involved in the appeal." *English v. City of Gainesville*, 75 F.4th 1151, 1155 (11th Cir. 2023) (citation and

internal quotation marks omitted). We lack jurisdiction where the only issues appealed are "evidentiary sufficiency" issues—that is, fact-related disputes about "whether the evidence could support a finding that particular conduct occurred." *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996); *accord Plumhoff v. Rickard*, 572 U.S. 765, 772 (2014) (explaining that we lack interlocutory jurisdiction if the district court "merely decided 'a question of "evidence sufficiency"'" (quoting *Johnson v. Jones*, 515 U.S. 304, 313 (1995))); *see also Behrens*, 516 U.S. at 312–13 ("Denial of summary judgment often includes a determination that there are controverted issues of material fact, and *Johnson* surely does not mean that *every* such denial of summary judgment is nonappealable. *Johnson* held, simply, that determinations of evidentiary sufficiency at summary judgment are not immediately appealable merely because they happen to arise in a qualified immunity case." (internal citation omitted)).

If, by contrast, the parties debate not only evidentiary sufficiency issues but also an "abstract issue of law" related to qualified immunity, "typically, the issue whether the federal right allegedly infringed was 'clearly established,'" *Behrens*, 516 U.S. at 313 (alteration adopted) (quoting *Johnson*, 515 U.S. at 317), we may decide both questions, *see, e.g., Stanley v. City of Dalton*, 219 F.3d 1280, 1286–87 (11th Cir. 2000) (holding that "when, as here, an interlocutory appeal presents both 'evidence sufficiency' and clearly established law issues," we may decide both questions because "the factual issue of what conduct the defendant engaged in . . . is a necessary part of the core qualified immunity analysis of whether the defendant's conduct violated clearly established law." (quoting

*McMillian v. Johnson*, 88 F.3d 1554, 1563 (11th Cir.), *amended on other grounds on reh'g*, 101 F.3d 1363 (11th Cir. 1996))).

When both the evidentiary sufficiency and clearly established issues are raised on appeal, "the appellate court has two options regarding how to deal with the factual issue." *Johnson v. Clifton*, 74 F.3d 1087, 1091 (11th Cir. 1996). We may accept the district court's findings of fact "if they are adequate." *Cottrell v. Caldwell*, 85 F.3d 1480, 1486 (11th Cir. 1996). "Or, we may conduct our own analysis of the facts in the light most favorable to the plaintiff." *Stanley*, 219 F.3d at 1287. Even if we chose the latter course, "we will not disturb a factual finding by the district court if there is any record evidence to support that finding." *Id.*

Because the parties here dispute not only whether the evidence is sufficient to create a jury question about whether Sellers violated Nelson's constitutional right, but also whether that right was clearly established when Nelson allegedly violated it, we have jurisdiction over both issues. And we "choose to conduct our own factual analysis" and review the first question anew "because 'such a determination is part of the core qualified immunity analysis.'" *Id.* (quoting *Johnson*, 74 F.3d at 1091).

B. *A Reasonable Jury Could Find That Sellers Violated Nelson's Right.*

Because the survivors do not dispute that Sellers acted within his discretionary authority, they must establish that a reasonable jury could find that Sellers violated Nelson's constitutional right, and that his right was "clearly established" when Sellers violated it. *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019)

(citation and internal quotation marks omitted). The survivors argue that Sellers was "deliberate[ly] indifferen[t] to a known, substantial risk of serious harm to [Nelson]" by doing nothing to isolate Hatchett from white inmates after learning the racial motive for his violent crime. *Goodman v. Kimbrough*, 718 F.3d 1325, 1331 (11th Cir. 2013) (quoting *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003)). "A prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate [that causes serious harm to that inmate] violates the Fourteenth Amendment." *Id.* (citation and internal quotation marks omitted); *see Cottone*, 326 F.3d at 1358 ("[A] plaintiff [claiming deliberate indifference] must show that the constitutional violation caused the injury.").

We first consider whether the jail detainee faced a substantial risk of serious harm. We ask whether a reasonable jury could find that the detainee encountered "a strong likelihood, rather than a mere possibility," of grievous injury. *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (citation and internal quotation marks omitted). Proof of the attacker's "generally problematic nature" or "propensity to misbehave" will not suffice to prove that he posed a substantial risk of serious harm to the detainee. *Bowen v. Warden, Baldwin State Prison*, 826 F.3d 1312, 1322 (11th Cir. 2016) (citation and internal quotation marks omitted). The evidence must establish a greater "degree of specificity in the risk of harm posed to [the victim.]" *Id. Compare Cottone*, 326 F.3d at 1355–58 (detainee plausibly alleged that cellmate posed substantial risk of serious harm to all others based on cellmate's "violent tendencies," "history of schizophrenia," and prior assault on "another inmate"), *and*

*Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 617 n.12 (11th Cir. 2007) (evidence of specific death threats from other prisoners sufficient to survive summary judgment), *with Brown*, 894 F.2d at 1537 (prisoner's report of unspecified "racial problem" in his shared cell insufficient).

Drawing all factual inferences in the survivors' favor, Hatchett's underlying offense made the risk of serious harm he posed to white detainees, including Nelson, obvious. Because Hatchett was being detained for stabbing "the first white guy he s[aw]" based solely on his race, a jury could reasonably find that there was a "strong likelihood" that Hatchett would seriously injure a white cellmate for the same reason. *Brown*, 894 F.2d at 1537 (citation and internal quotation marks omitted). The survivors' expert testified that it was "obvious . . . that the racial motivation of [Hatchett's] pre-arrest assault . . . indicated a threat to white inmates." And the classification officers stated that they would have taken steps to isolate Hatchett from white inmates had the officers known of his racial motive. The record establishes more than "some unspecified risk of harm," *Marbury v. Warden*, 936 F.3d 1227, 1238 (11th Cir. 2019)—Hatchett's unprovoked stabbing of a random white man solely because of the man's race evidenced the *deadly* risk he posed to a *white* detainee.

The survivors also provided enough evidence from which a jury could reasonably find that Sellers was deliberately indifferent to the substantial risk of serious harm Nelson faced. This element "has two components: one subjective and one objective." *Mosley v.*

*Zachery*, 966 F.3d 1265, 1270 (11th Cir. 2020) (citation and internal quotation marks omitted). The subjective component requires evidence that the defendant officer "actually (subjectively) knew" of the risk to the plaintiff inmate. *Id.* at 1270–71 (alterations adopted) (quoting *Bowen*, 826 F.3d at 1320). This standard is one of "subjective recklessness as used in the criminal law," *Farmer v. Brennan*, 511 U.S. 825, 839–40 (1994), and it is "a difficult burden for a plaintiff to meet," *West v. Tillman*, 496 F.3d 1321, 1327 (11th Cir. 2007) (citation and internal quotation marks omitted). The objective component requires evidence that the officer "disregard[ed] th[e] known risk by failing to respond to it in an (objectively) reasonable manner." *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014) (first alteration in original) (quoting *Rodriguez*, 508 F.3d at 617).

Sellers challenges only the subjective component of the deliberate indifference standard. That is, he does not meaningfully dispute that if a reasonable jury could find that he *knew* the risk Nelson faced, his failure to act was objectively unreasonable. He disputes only that a reasonable jury could find that he did, in fact, know of that risk.

To evaluate this challenge, we recount what Sellers knew, viewing the evidence in the light most favorable to the survivors. *See id.* at 1100. Sellers knew that Hatchett stabbed a white man in the back after watching videos of white-on-black police shootings; that Hatchett stabbed the man solely because he was white; that classification officers assigned Hatchett to a cell with Nelson, a

white man; that Hatchett was polite and cooperative with officers Sellers and Burgess during the booking process; that Hatchett never threatened anyone in the jail; and that Nelson never reported feeling threatened.

A jury faced with this evidence could reasonably infer that Sellers *knew* of the obvious risk of serious harm Hatchett posed to Nelson. Hatchett's composure during his interactions with Burgess and Sellers, two police officers, reveals little about Hatchett's risk to white inmates. The Supreme Court also has expressly rejected the argument that an injured inmate must have "expressed" to prison officials a "concern for his safety." *Farmer*, 511 U.S. at 848 ("[T]he failure to give advance notice [of a cellmate attack] is not dispositive."). And a jury would be free "to disregard" Sellers's "self-serving (and unsupported)" testimony that he did not perceive Hatchett to pose a risk of violence to a white detainee. *See United States v. Stein*, 881 F.3d 853, 858 (11th Cir. 2018) (en banc). Indeed, a jury could reasonably discount that testimony in view of the abundant circumstantial evidence to the contrary. *See, e.g., Marbury*, 936 F.3d at 1237 (holding plaintiff can prove subjective component using "circumstantial evidence" (citation and internal quotation marks omitted)). *But cf. Goodman*, 718 F.3d at 1333–34 (summary judgment for defendants was warranted when "the *only* evidence of what Officers . . . were actually aware of [wa]s their own adamant denials of the fact that they ever feared for [the inmate]'s safety in any way" (emphasis added)). Indeed, "a factfinder may conclude that a prison official knew of a substantial risk from the

very fact that the risk was obvious," *Farmer*, 511 U.S. at 842, and a jury could reasonably find that the risk here was.

The survivors must also prove "a causal connection between [Sellers's] conduct and the [Fourteenth] Amendment violation." *Bowen*, 826 F.3d at 1320. This causal element requires proof that the officer "(1) had the means substantially to improve the inmate's safety, (2) knew that the actions he undertook would be insufficient to provide the inmate with reasonable protection from violence, and (3) had other means available to him which he nevertheless disregarded." *Rodriguez*, 508 F.3d at 622 (alterations adopted) (citation and internal quotation marks omitted).

This record would permit a reasonable jury to find the "necessary causal link" between Sellers's inaction and Nelson's death. *Id.* at 623 (internal quotation marks omitted). Sellers had the means to protect Nelson from Hatchett: he could have told a classification officer about the risk of harm Hatchett posed to white inmates. Although the classification officers, not the intake officers, bore final inmate-placement responsibility, "proof of causation . . . does not turn on the ultimate placement or classification decision." *See id.* at 624 n.20; *accord Farmer*, 511 U.S. at 850. It is enough to prove that the official "had the authority to make . . . *recommendations* with respect to placement and classification decisions." *Rodriguez*, 508 F.3d at 624 n.20 (emphasis added). Sellers admitted that he had authority to make housing recommendations and that classification officers were receptive to such recommendations and would move an inmate if given a good reason. Hatchett's classification officers

confirmed that they would have acted on those recommendations. A reasonable jury could find too that Sellers knew his actions would be insufficient to protect Nelson because, as Sellers concedes, he did *nothing* to limit Hatchett's exposure to white detainees. *See id.* at 623.

### C. Nelson's Right Was Clearly Established.

All that remains is "the clearly established prong of the qualified immunity inquiry." *Helm v. Rainbow City*, 989 F.3d 1265, 1275 (11th Cir. 2021). A right is "clearly established" if controlling law gave the official "fair warning" that his conduct violated that right. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *accord, e.g.*, *Wade v. United States*, 13 F.4th 1217, 1225 (11th Cir. 2021). Fair warning can be established by identifying "a materially similar case," *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005), appealing to "a broader, clearly established principle [that] should control the novel facts" at hand, *id.*, or establishing that the challenged conduct "so obviously violates the Constitution that prior case law is unnecessary" to clarify its lawlessness, *Waldron v. Spicher*, 954 F.3d 1297, 1305 (11th Cir. 2020) (alterations adopted) (citation and internal quotation marks omitted).

The survivors rely upon only a broader, controlling principle that Nelson's right was clearly established. For a right to be clearly established under this method, "the principle must be established with obvious clarity by the case law" such that it would have been "apparent" to every reasonable officer that the defendant's conduct was unlawful. *Terrell v. Smith*, 668 F.3d 1244, 1256 (11th

Cir. 2012) (citations and internal quotation marks omitted). We agree with the survivors that the broad principles of our deliberate indifference precedents clearly control the facts of this case.

When Nelson died, it was clearly established that "prison officials have a duty" under the Constitution to take reasonable action "to protect prisoners from violence at the hands of other prisoners." *Bowen*, 826 F.3d at 1320 (quoting *Farmer*, 511 U.S. at 833) (applying the Eighth Amendment to a convicted prisoner's deliberate indifference claim); *see Goodman*, 718 F.3d at 1331 n.1 ("[T]he standards [for deliberate indifference claims] under the Fourteenth Amendment [for pretrial detainees] are identical to those under the Eighth [for convicted prisoners]." (citation and internal quotation marks omitted)). And it was clearly established that an officer violates this duty if he "knows that one prisoner poses a substantial risk of serious harm to another, yet fails to take any [reasonable] action" to separate them. *Caldwell*, 748 F.3d at 1102 (first citing *Cottone*, 326 F.3d at 1358–60; then citing *Hale v. Tallapoosa County*, 50 F.3d 1579, 1584 (11th Cir. 1995); and then citing *LaMarca v. Turner*, 995 F.2d 1526, 1536–38 (11th Cir. 1993)); *see Cottone*, 326 F.3d at 1358 ("A Fourteenth Amendment violation occurs when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not respond reasonably to the risk," causing serious harm to the inmate.).

Sellers had fair warning that it was unconstitutional not to prevent the placement of a white detainee alone in a cell with another detainee who, the day before, stabbed a stranger solely for

being white. *See Patel v. Lanier County Georgia*, 969 F.3d 1173, 1190 (11th Cir. 2020) (holding, before Hatchett's arrest, that "broad [deliberate indifference] principle[s] ha[ve] put all law-enforcement officials on notice that if they actually know about a condition that poses a substantial risk of serious harm and yet do *nothing* to address it, they violate the Constitution."). Because controlling caselaw placed the illegality of Sellers's conduct "beyond debate" by the time of Hatchett's arrest, Sellers is not immune from suit for that conduct. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

## IV. CONCLUSION

We **AFFIRM** the denial of qualified immunity.

22-14205                Abudu, J, Concurring                1

ABUDU, Circuit Judge, Concurring:

I agree with the majority's decision to affirm the district court's denial of Keyvon Sellers's motion for summary judgment on qualified immunity grounds.  At the summary judgment stage, there is evidence, albeit barely more than a scintilla, supporting a reasonable jury's determination that Eddie Lee Nelson's killing was racially motivated.  I write separately to highlight that the evidence of that motivation, however, is extremely thin.  What the record does show though is that jail can be a violent, dangerous place.  The majority's decision cements the legal principle that incarcerated individuals may bring a race-based failure to protect claim even on a record as bare bones—again as to that motivation—as Nelson's estate presented in this case.  To clarify, the law that this Circuit has now clearly established is this: "prison officials have a duty" under the Fourteenth Amendment to take reasonable action "to protect prisoners from violence at the hands of other prisoners" when officials have a reasonable belief that another inmate might have racial animus and, thus, is dangerous even when that inmate is housed with others of different races and ethnicities for several days without incident.  Maj. Op. at 6-7; *See Bowen v. Warden Baldwin State Prison*, 826 F.3d 1312, 1320 (11th Cir. 2016).

"We review de novo a district court's grant of summary judgment, applying the same standard that bound the district court and viewing the evidence and all reasonable inferences in the light most favorable to [Nelson's estate]."  *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 616 (11th Cir. 2007) (citing *Drago v. Jenne*, 453

F.3d 1301, 1305 (11th Cir. 2006)). "[Then], [w]ith the plaintiff's best case in hand, the court is able to move to the question of whether the defendant committed the constitutional violation alleged in the complaint without having to assess any facts in dispute." *Robinson v. Arrugueta*, 415 F.3d 1252, 1257 (11th Cir. 2005). In a Fourteenth Amendment due process case premised on a penal institution's failure to reasonably protect its occupants, such as the one brought forth here, a plaintiff must show: "(1) a substantial risk of serious harm existed; (2) the defendant[] [was] deliberately indifferent to that risk, i.e., [he] both subjectively knew of the risk and also disregarded it by failing to respond in an objectively reasonable manner; and (3) there was a causal connection between the defendant[']s[] conduct and the [constitutional] violation." *Bowen*, 826 F.3d at 1320 (citing *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014)). The plaintiff must also show "that the constitutional right was clearly established at the time of [the] conduct." *Id.* at 1319 (alteration in original) (citing *Perez v. Suszczynski*, 809 F.3d 1213, 1218 (11th Cir. 2016)). This Court has identified three ways in which a plaintiff can demonstrate that a constitutional right has been clearly established:

> First, the plaintiff can point to a materially similar case decided at the time of the relevant conduct by the Supreme Court, the Eleventh Circuit, or the relevant state supreme court. . . . The prior case law need not be directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate. Second, the plaintiff can identify a

22-14205                 Abudu, J, Concurring                    3

broader, clearly established principle that should gov-
ern the novel facts of the situation.  Third, the plaintiff
can show that the conduct at issue so obviously vio-
lated the Constitution that prior case law is unneces-
sary.

*J W ex rel. Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1259-
60 (11th Cir. 2018) (internal quotation marks and citations omit-
ted).  Thus, even if a plaintiff demonstrates that a reasonable jury
could find a constitutional violation, this Court can and does deny
relief on the basis of qualified immunity.  *See, e.g., Youmans v. Gag-
non*, 626 F.3d 557, 565-66 (11th Cir. 2010) (granting police officer
qualified immunity after ruling that pretrial detainee's right to
medical care after being beaten and visibly bruised by other officers
was not clearly established). This Court has also historically ex-
pressed that the third method of showing a law is clearly estab-
lished—using a broader, controlling principle that applies with ob-
vious clarity—"[is] rare and [doesn't] arise often." *King v. Pridmore*,
961 F.3d 1135, 1146 (11th Cir. 2020) (citing *Gaines v. Wardynski*, 871
F.3d 1203, 1209 (11th Cir. 2017)(collecting cases)); *Coffin v. Brandau*,
642 F.3d 999, 1015 (11th Cir. 2011) ("Our case law has made clear
that 'obvious clarity' cases will be rare") (collecting cases); *Santamo-
rena v. Ga. Mil. Coll.*, 147 F.3d 1337, 1340 n.6 (11th Cir. 1998) ("these
exceptional cases rarely arise").

This decision is, therefore, especially groundbreaking con-
sidering the number of qualified immunity cases in which plaintiffs
have relied on a "broader controlling legal principle," which this

4                     Abudu, J., Concurring                  22-14205

Court has rejected. *See, e.g.*, *Wade v. United States*, 13 F.4th 1217, 1229 (11th Cir. 2021) (granting correctional officer qualified immunity in ruling that plaintiff's right to medical attention for a broken, bleeding hand prior to being transferred to another cell was not clearly established despite plaintiff's argument that right was encompassed within a broader, clearly established principle); *Gaines*, 871 F.3d at 1214 (granting qualified immunity to Superintendent of school district, ruling that any prohibition against defendant denying teacher a promotion based on a family member's public criticisms of the school district was based on "First Amendment principles at a high level of generality" and, thus, not clearly established); *Dukes v. Deaton*, 852 F.3d 1035, 1044 (11th Cir. 2017) (granting a defendant officer accused of excessive force qualified immunity despite finding that a Fourth Amendment violation occurred because "the contours of the right were not clearly established").

We have also suggested that the broader, general principle articulated in this case was *not* clearly established. *See, e.g., Carter v. Galloway*, 352 F.3d 1346, 1349, 1350 n.10 (11th Cir. 2003) (finding that plaintiff failed to satisfy subjective prong of deliberate indifference claim against officers for failure to protect him from physically abusive cellmate, but noting that claim would have failed in any event because right "was not clearly established in Plaintiff's favor").

Prisons and jails are widely known to be one of the most dangerous housing situations in the world. *See, e.g.*, Keri Blakinger,

22-14205                Abudu, J, Concurring                5

*Why So Many Jails Are in a 'State of Complete Meltdown'*, THE MARSHALL PROJECT, https://www.themarshallproject.org/2022/11/04/why-so-many-jails-are-in-a-state-of-complete-meltdown (Nov. 4, 2022, 1:00 pm) ("[W]hile the infamous Rikers Island jail complex in New York City has been the focus of media coverage for its surging number of deaths, rural and urban lockups from Tennessee to Washington to Georgia are not faring much better."); Matt Ford, *The Everyday Brutality of America's Prisons*, NEW REPUBLIC (Apr. 5, 2019), https://newrepublic.com/article/153473/everyday-brutality americas-prisons (profiling a Justice Department report regarding "inmate deaths and violence across the country that, taken together, paint a grim picture of the brutality that occurs behind prison walls" and noting that "[j]ails hold a far greater number of people than prisons, and often include people who are awaiting trial and thus haven't been found guilty of a crime. . . . It's no surprise that funneling at-risk individuals into a hostile environment can have fatal consequences.").

The Muscogee County jail created specific policies for classifying inmates who might be especially vulnerable to assault at the hands of other inmates. While in no way minimizing Nelson's tragic death, the record shows that, at least on paper, and given that Hatchett was in pretrial detention and not yet convicted of any crime, Nelson arguably was a danger to Hatchett as well.

Muscogee's inmate classification system categorizes inmates as "high risk" if their current offense or previous conviction was for a violent charge. In this case, Nelson, who was 39, was incarcerated

based on his failure to register as a sex offender.  His classification documents noted he had a previous conviction for rape.  He ultimately received a classification that reflected his status as a sex offender and his violent criminal history and was classified to be in "maximum" detention.  The next question that this case poses is whether someone in Hatchett's situation who was 19 years old and now alone in a cell with Nelson, could defeat a qualified immunity defense if Nelson had attacked and injured him instead.  Perhaps the answer to that question is now definitively yes, which means victims of assault in jail are clearly entitled to heightened protections.

While the Court has adopted the race-based claim that Nelson's estate proffers as the reason for Nelson's murder, a jury could instead find that there was another, non-racially motivated, reason for the assault.  To underscore this point, one can simply look to Hatchett's behavior when he was placed in a cell with two white detainees: Rae Nolan and Nelson.  Hatchett spent his first day in detention alone with Nolan.  Nelson joined their cell the next day.  Hatchett, Nolan, and Nelson were cellmates together for five days.  While Hatchett was in a cell with these two other white men, he never expressed any hate for white people, and he never made any racist comments to either Nolan or Nelson.  In fact, Hatchett and Nolan got along.  He traded Nolan his breakfast tray for Nolan's cookies at night.  After Nolan was moved out of their cell, Nelson and Hatchett remained cellmates for four more days without Nelson ever reporting to Sellers or anyone else that he felt like he was in danger in his cell or otherwise threatened by Hatchett.

22-14205                Abudu, J, Concurring                7

When Hatchett did attack Nelson, the words out of his mouth were not racial slurs or race-related comments—they were about hair in his food.  In fact, Correctional Officer Sabrina Millison stated that, following the incident and while Hatchett was being held behind a cell door while other officers tried to resuscitate Nelson, Hatchett's comments to her were: "he [Nelson] touched my food," and "he [Nelson] put hair in my food."

Based on this constellation of facts, it is not clear whether Nelson faced "a strong likelihood," *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (citation and internal quotation marks omitted), of "a substantial risk of serious harm," *Bowen*, 826 F.3d at 1322 (citation and internal quotation marks omitted), solely based on his race.  However, again, when we view the limited evidence in the light most favorable to Nelson's estate, that is a question for a jury to decide.

Nevertheless, this Circuit has now recognized (1) the alleged constitutional violation of Nelson's rights has been clearly established; and (2) any evidence of racial animus—even when there may be other motivations behind the assailant's actions—is sufficient to overcome qualified immunity under these circumstances. I hope these tenets remain true for subsequent cases brought by plaintiffs regarding the threats and violence they have faced while incarcerated.

22-14205          Ed Carnes, J, Concurring          1

ED CARNES, Circuit Judge, joined by WILLIAM PRYOR, Chief Judge, concurring:

   We concur in all of the Court's opinion and write separately to respond to some of the statements in the other concurring opinion.

I.

   This Court has often stressed that no decision can hold anything that goes beyond the facts of the case. *See, e.g.*, *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010) ("We have pointed out many times that regardless of what a court says in its opinion, the decision can hold nothing beyond the facts of that case. All statements that go beyond the facts of the case . . . are dicta. And dicta is not binding on anyone for any purpose.") (citations omitted); *Chavers v. Sec'y, Fla. Dep't of Corr.*, 468 F.3d 1273, 1275 (11th Cir. 2006) ("The holdings of a prior decision can reach only as far as the facts and circumstances frame the precise issue presented in that case."); *Watts v. BellSouth Telecomms., Inc.*, 316 F.3d 1203, 1207 (11th Cir. 2003) ("Whatever their opinions say, judicial decisions cannot make law beyond the facts of the cases in which those decisions are announced."); *United States v. Aguillard*, 217 F.3d 1319, 1321 (11th Cir. 2000) ("The holdings of a prior decision can reach only as far as the facts and circumstances presented to the Court in the case which produced that decision.") (quoting *United States v. Hunter*, 172 F.3d 1307, 1309 (11th Cir. 1999) (Carnes, J., concurring)); *see also Moon v. Head*, 285 F.3d 1301, 1318 (11th Cir. 2002) (Carnes, J., concurring) ("Those statements are dicta. They are

dicta because they go beyond the facts of the [earlier] case it-self . . . ."); *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1265 (11th Cir. 2007) ("Judicial opinions do not make binding prece-dents; judicial decisions do.") (alteration adopted) (quotation marks omitted).

Our colleague's separate concurring opinion would take a more expansive approach by interpreting the Court's decision to "recognize[]" that "*any* evidence of racial animus—even when there may be other motivations behind the assailant's actions—is sufficient to overcome qualified immunity under these circum-stances." Abudu Concurrence at 7 (emphasis added). Our decision does not recognize or even imply that, and it certainly does not hold that. Reframing our decision in that way would defy all of our many precedents stressing that a holding reaches only as far as the facts and circumstances of the case. *See, e.g.*, *Chavers*, 468 F.3d at 1275.

Let's start with the most obvious point about race. This is not a case in which any prison guard or official is accused of racial discrimination. Race played only one role in this tragic tale: A jury could find that racial hatred motivated Hatchett, a black inmate, to murder Nelson, a white inmate, solely because he was white. The Constitution does not forbid inmates from discriminating against other inmates based on race, and Hatchett is not a defendant in this case. The defendant is Sellers, an intake officer at the detention center. The claim against him is not that he discriminated against any inmate based on race. The claim is that he was deliberately

22-14205                Ed Carnes, J, Concurring                3

indifferent to the substantial risk that Hatchett would attack a white inmate if he was put into a cell with one, and as a result, Hatchett was celled with a white inmate and murdered him.

Even if we wanted to do so, we could not hold in this case that "any evidence" of racial animus by the inmate assailant is somehow enough to overcome an official's qualified immunity, *see* Abudu Concurrence at 7. We could not because those are not the only facts of this case. Instead, the facts of the case include a prison official being deliberately indifferent to a specific risk of violence that could have been avoided with minimal effort by him, but he did nothing to address it. A future panel cannot ignore some facts in this case to convert it into a broader precedent. And we can't either. A decision in a case including facts A + B + C that concludes those facts together amount to a constitutional violation cannot be binding precedent for the proposition that either A alone, or A + B without C, is a constitutional violation.

The specific facts at this stage, as the opinion of the Court recounts them, are that Sellers was an intake officer who helped process Hatchett into the detention center. *See* Maj. Op. at 4. And Sellers knew that Hatchett had been arrested for going into a store and stabbing a stranger in the back. *See id*. at 4, 13. And he knew that Hatchett, a black man, had stabbed that stranger solely because the man was white. *See id*. And Hatchett told Sellers that he had "seen a video" of cops killing black people and "decided [he] was gonna stab a white guy" in response. *See id*. at 4. And Sellers

knew that Hatchett had done exactly that the day before he was being processed into the detention center. *See id.* at 3–4.

Not only all of that, but both classification officers testified that had they known Hatchett's unprovoked stabbing of a stranger the day before he was arrested was racially motivated, they would not have put him in a cell with a white detainee. *See id.* at 6. And Sellers himself admitted that he knew classification officers would move an inmate if "given a good reason." *See id.* at 5. Yet, he "did *nothing* to limit Hatchett's exposure to white detainees." *Id.* at 16.

"In deliberate-indifference cases, as in life, context matters." *Mosley v. Zachery*, 966 F.3d 1265, 1272 (11th Cir. 2020). Based on the facts as presented at the summary judgment stage, our opinion holds only that at the time of Nelson's death it was clearly established that if a prison official actually knows about a condition that poses a substantial risk of serious harm to an inmate and does not take *any* reasonable steps to prevent that harm, causing the inmate injury, he violates the Constitution. *See* Maj. Op. at 17–18; *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1100–03 (11th Cir. 2014); *Cottone v. Jenne*, 326 F.3d 1352, 1359–60 (11th Cir. 2003); *Patel v. Lanier County Georgia*, 969 F.3d 1173, 1190 (11th Cir. 2020).

Our holding is not "groundbreaking," *see* Abudu Concurrence at 3. Far from it. We've previously held that if a prison official was deliberately indifferent to a serious risk of harm that could have been (but wasn't) avoided with a reasonable amount of effort, the officer may be held liable. *See, e.g.*, *Bowen v. Warden, Baldwin State Prison*, 826 F.3d 1312, 1320–25 (11th Cir. 2016) (denying

22-14205                Ed Carnes, J, Concurring                5

qualified immunity and holding that the plaintiff had plausibly alleged a deliberate indifference claim against two prison officials who were aware that an inmate was "a severe paranoid schizophrenic who suffered from violent delusions, auditory hallucinations, and impulsive tendencies" and knew that he had committed a "High-Assault" against his previous cellmate but took no steps to protect the cellmate he killed); *Caldwell*, 748 F.3d at 1101–03 (denying qualified immunity and holding that where prison officials knew an inmate had a history of past prison violence and had started a fire in his cell using the plaintiff's personal belongings, a jury could reasonably find that the officials "actually knew of a substantial risk" that the inmate "would seriously harm" the plaintiff); *Cottone*, 326 F.3d at 1358–60 (denying qualified immunity and holding that the plaintiff plausibly alleged deliberate indifference where the prison officials failed to monitor or supervise a visibly violent and mentally unstable inmate they knew posed a substantial risk of serious harm to other inmates); *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 618–24 (11th Cir. 2007) (vacating a grant of summary judgment and judgment as a matter of law entered in favor of prison officials on a deliberate indifference claim where the officials were aware of specific gang-related threats against the plaintiff but did not take available steps to protect the plaintiff, who was later stabbed).

According to the facts as we take them at this stage, Sellers was put on notice during Hatchett's intake that he was especially violent toward white people and had, only the day before, stabbed a total stranger in the back solely for being white. It would have

6                    Ed Carnes, J., Concurring                    22-14205

taken only a miniscule amount of effort for Sellers to prevent the danger that Hatchett posed to white detainees.[1] All he had to do was tell one of the classification officers that Hatchett's violent crime had been motivated by a desire to harm white people. And a jury could reasonably find that Sellers' failure to act caused Nelson, Hatchett's second victim, to be killed.[2]. Concluding that those facts would establish deliberate indifference breaks no new ground; instead, the conclusion rests on well-ploughed ground and is entirely in keeping with our precedents. *See Bowen*, 826 F.3d at 1320–24; *Caldwell*, 748 F.3d at 1100–02; *Cottone*, 326 F.3d at 1358–60; *Rodriguez*, 508 F.3d at 618–24.

Our concurring colleague asserts that "it is not clear whether Nelson faced 'a strong likelihood' of 'a substantial risk of serious harm' solely based on his race." Abudu Concurrence at 7 (internal citations omitted) (quoting first *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990), then *Bowen*, 826 F.3d at 1322). But drawing

---

[1] As our colleague's concurring opinion acknowledges, the reasonableness of the potentially preventative action is important. *See* Abudu Concurrence at 1; *Caldwell*, 748 F.3d at 1099 (explaining that the objective component of deliberate indifference requires evidence that the officer disregarded the known risk by "failing to respond to it in an (objectively) reasonable manner") (quotation marks omitted).

[2] Sellers disputes only the subjective component of deliberate indifference, arguing that no reasonable jury could find that he had actual, subjective knowledge of the risk Hatchett posed to Nelson. *See Mosely v. Zachery*, 966 F.3d 1265, 1270–71 (11th Cir. 2020). But, as detailed in the majority opinion, there was enough evidence that Sellers did actually, subjectively know about it and that he disregarded that known risk. *See* Maj. Op. at 13–14.

all reasonable inferences in the plaintiffs' favor (as we must here), it *is* clear that Nelson did face a substantial risk of serious harm. *See* Maj. Op. at 11–12. Hatchett had already shown that, seeking racial vengeance, he would violently attack someone solely because he was white. After all, it was only the day before he was processed into the detention center that Hatchett had been arrested for stabbing in the back "the first white guy he s[aw]" just because he was white.

The two classification officers testified that had they known the stabbing for which Hatchett was arrested was racially motivated, they would not have put him in a cell with a white detainee "for the safety" of that detainee. The plaintiffs' expert agreed that because of the racial motivation behind the stabbing, Hatchett "obvious[ly]" posed a "threat to white inmates." The evidence viewed in the light most favorable to the plaintiffs shows more than "some unspecified risk of harm to [Nelson's] well-being," *see Marbury v. Warden*, 936 F.3d 1227, 1238 (11th Cir. 2019), and more than the "mere possibility" of injury, *see Brooks v. Warden*, 800 F.3d 1295, 1301 (11th Cir. 2015); it shows that Hatchett posed a "specific[]" and "particularized threat" to Nelson and other white inmates, *see Bowen*, 826 F.3d at 1322 (quotation marks omitted).

The other concurring opinion asserts that the evidence of a racial motivation for the murder is "extremely thin," Abudu Concurrence at 1. To the contrary, viewing the evidence in the light most favorable to the plaintiff, there is plenty of it. For example, the evidence shows that Hatchett told three different officers or jail

employees that he was there because he stabbed a stranger solely because of the stranger's race, after watching videos about police violence against black people.  He also told two of his cellmates that after watching "one of them cop shooting videos," he got "mad," and he stabbed "the first white guy he seen."  And the day after killing his cellmate, in talking to a psychiatrist, Hatchett "[m]entioned about his [cellmate] talking about racial things."

More to the point, there is enough evidence from which a jury could reasonably find that there was a "strong likelihood" that Hatchett would seriously harm Nelson, *see Brown*, 894 F.2d at 1537, that Sellers actually knew about that substantial risk of serious harm, *see Caldwell*, 748 F.3d at 1102, that Sellers knew he could do something about it but did nothing, *see Rodriguez*, 508 F.3d at 622, and that his failure to act caused Nelson's death, *see id*. at 617, 622–24, 624 n.20.  As we've mentioned, the other concurring opinion states that "any evidence of racial animus—even when there may be other motivations behind the assailant's actions—is sufficient to overcome qualified immunity under these circumstances."  Abudu Concurrence at 7.  But "any evidence of racial animus" by a prisoner, regardless of whether there are other motivations, is not enough to show a constitutional violation, much less to overcome qualified immunity.

As the Supreme Court has stressed, "It is not . . . every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety."  *Farmer v. Brennan*, 511 U.S. 825, 834 (1970).  Prisons

22-14205                Ed Carnes, J, Concurring                9

and jails are inherently dangerous places.  *See id.* at 858 (Thomas, J., concurring in the judgment) ("Prisons are necessarily dangerous places . . . ."); *Kincaid v. Williams*, 143 S. Ct. 2414, 2419 n.2 (2023) (Alito, J., dissenting) (referring to "the uniquely dangerous context of prison"); *United States v. Prevo*, 435 F.3d 1343, 1346 (11th Cir. 2006) ("Because of the character of prisoners and the nature of imprisonment, corrections facilities are volatile places, brimming with peril, places where security is not just an operational nicety but a matter of life or death importance."); *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 333 (2012) ("Jails are often crowded, unsanitary, and dangerous places."); *Ort v. White*, 813 F.2d 318, 322 (11th Cir. 1987) (in a prison discipline case, explaining that "in evaluating the challenged conduct of prison officials, a court must keep in mind the paramount concerns of maintaining order and discipline in an often dangerous and unruly environment"); *Spear v. Sowders*, 71 F.3d 626, 630 (6th Cir. 1995) (en banc) ("Prisons are dangerous and filled with law-breaking because that is where the criminals are.  Even the most secure prisons are dangerous places for inmates, employees, and visitors."); *see also* Abudu Concurrence at 4 ("Prisons and jails are widely known to be one of the most dangerous housing situations in the world."). "[T]hey house society's most antisocial and violent people in close proximity with one another." *Farmer*, 511 U.S. at 858; *see also Hudson v. Palmer*, 468 U.S. 517, 526 (1984) ("Prisons, by definition, are places of involuntary confinement of persons who have a demonstrated proclivity for antisocial criminal, and often violent, conduct.").

Given all of those decisions, our circuit law does not suggest, let alone establish, that any time an inmate assaults another inmate for racial reasons some prison official has in some way violated the Constitution. And our decision today does not suggest that either. A prison official violates the Constitution only when the inmate can show that he was "incarcerated under conditions posing a substantial risk of serious harm," *Farmer*, 511 U.S. at 834 (majority opinion), and that the official knew of and consciously disregarded that substantial risk, *id.* at 837–38, and that the official's action or inaction caused injury, *see Bowen*, 826 F.3d at 1320; *Cottone*, 326 F.3d at 1358; *see also Brown*, 894 F.2d at 1537 ("When officials become aware of a threat to an inmate's health and safety, the Eighth Amendment's proscription against cruel and unusual punishment imposes a duty to provide reasonable protection. Merely negligent failure to protect an inmate from attack does not justify liability under section 1983, however. Prison officials must have been deliberately indifferent to a known danger before we can say that their failure to intervene offended evolving standards of decency, thereby rising to the level of a constitutional tort.") (citations and quotation marks omitted).

Despite what the other concurrence suggests, victims of assault in jail are not entitled to any "heightened protections," Abudu Concurrence at 6. Prison officials are not required to guarantee inmates' safety from another inmate, regardless of the other inmate's motivation for violence. *See Farmer*, 511 U.S. at 834; *see also Purcell ex rel. Est. of Morgan v. Toombs County*, 400 F.3d 1313, 1321 (11th Cir. 2005) ("[A] prison custodian is not the guarantor of a

22-14205                Ed Carnes, J, Concurring                11

prisoner's safety.") (quotation marks omitted).   As the Court's opinion in this case points out, "A prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate" is what violates the Constitution.  *See* Maj. Op. at 11.  It does not matter if the substantial risk that one inmate will seriously injure or kill another is motivated by race, religion, gang affiliation, or something else.   The decisions of the Supreme Court and this Court draw the line based on deliberate indifference, not based on the specific motivation that created the substantial risk of harm.

## II.

One final note.  To the extent that the concurring opinion's last paragraph implies that the qualified immunity issue is out of this case, *see* Abudu Concurrence at 7, our circuit precedent establishes otherwise. At this summary judgment stage, we view the facts and draw all reasonable inferences in the plaintiffs' favor. *See Caldwell*, 748 F.3d at 1103.  But we recognize that even though a plaintiff gets past summary judgment, he "may not be able to prove such facts to the satisfaction of the jury" and "the jury may elect not to draw inferences from the circumstantial evidence in [the plaintiff's] favor."  *Id*.  The point is that "what we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion[] may not be the actual facts" decided at trial. *Swint v. City of Wadley*, 51 F.3d 988, 992 (11th Cir. 1995); *see Farrow v. West*, 320 F.3d 1235, 1239 n.2 (11th Cir. 2003) (same).

"Any qualified immunity defenses that do not result in summary judgment [for the defendant] before trial may be renewed at

trial," *Swint*, 51 F.3d at 992, where the jury can "find the relevant facts bearing on the qualified immunity issue," *Simmons v. Bradshaw*, 879 F.3d 1156, 1164–65 (11th Cir. 2018).  At trial Sellers can "urge the jury to view the record as []he has framed it, seek special interrogatories to resolve historical facts underlying [his] immunity argument, and then resubmit the issue to the district court for decision." *Butler v. Smith*, 85 F.4th 1102, 1118 n.6 (11th Cir. 2023); *see also Kelly v. Curtis*, 21 F.3d 1544, 1546–47 (11th Cir. 1994) ("[A] defendant who does not win summary judgment on qualified immunity grounds may yet prevail on those grounds at or after trial on a motion for a judgment as a matter of law.").

If Sellers does renew the qualified immunity defense at trial, and if the evidence at trial could support a jury finding on the facts that would support qualified immunity, the district court can, and when needed should, "use special verdicts or written interrogatories to the jury to resolve disputed facts before the judge rules on the qualified-immunity question." *Cottrell v. Caldwell*, 85 F.3d 1480, 1487 (11th Cir. 1996) (quotation marks omitted).