**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————

No. 24-12167

————————————

RACHEAL GANTT,

*Plaintiff-Appellee,*

*versus*

DEPUTY EVERETT,
  Jefferson County Corrections Officer,

*Defendant-Appellant.*

————————————

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 2:23-cv-00648-RDP

————————————

Before WILLIAM PRYOR, Chief Judge, and LAGOA and KIDD, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This interlocutory appeal requires us to decide whether a deputy was deliberately indifferent to injuries suffered by an

inmate during her attempted suicide. After Deputy Monica Everett saw that Racheal Gantt had suffered a head injury that needed medical attention and spoke with a nurse about it, she remotely unlocked Gantt's jail cell door to transport her to the medical clinic. Gantt suddenly ran up a flight of stairs and jumped from a second-story landing. Gantt sued Everett for deliberate indifference, 42 U.S.C. § 1983, and Everett later moved for summary judgment based on qualified immunity. The district court denied summary judgment. We vacate and remand with instructions to grant Everett qualified immunity because she did not violate Gantt's constitutional rights.

## I. BACKGROUND

This appeal arises out of Racheal Gantt's pretrial detainment at the Jefferson County Jail. After Gantt expressed suicidal thoughts to mental health personnel, she was placed on suicide watch and transferred to the A Block. The A Block is on the fifth floor, and it contains two stories of cells that open to a common area called the "day space." Gantt was placed in a cell on the bottom story. Because she was on suicide watch, Gantt had a "suicide smock" instead of a standard uniform. Suicide smocks are thick, green Velcro blankets that inmates cannot rip or tear.

On February 8, 2023, Deputies Morgan and Yunker were working on the fifth floor where Gantt was detained. Control Room Operator Lovell was stationed in the fifth-floor control room. Deputies can unlock cell doors from the control room or, while standing in a particular block, use the intercom system to

request that the control room operator unlock a certain cell door. When a cell door is unlocked from the control room, it swings open.

Everett was stationed on the first floor that day, but she went to the fifth floor "to assist with a shakedown in [the] F Block." During the shakedown, Everett and Deputy McCants escorted a female inmate from the F Block to the A Block for disciplinary purposes.

In the A Block, Everett heard Gantt "screaming and crying hysterically" in her cell. Everett had never interacted with or heard of Gantt. Everett testified that suicide attempts are "well-known throughout the jail," and that she "would have heard [Gantt's] name plenty of times if she had done anything." But Everett knew that prison staff typically kept suicidal inmates on the bottom floor of the A Block because jumping off the second-story landing is an "obvious suicide" risk. Before the incident with Gantt, Everett knew of two inmates in the general jail population who had jumped off the second-story landing and injured themselves.

Everett noticed Gantt's suicide smock and realized that she was on suicide watch, which meant "that at some point, [Gantt] had to have told somebody she wanted to kill herself." Gantt told Everett that she had a head injury, but it is unclear precisely what Gantt said. In any event, Everett saw a "large knot" on Gantt's head, so she went to the control room and called the medical clinic.

A nurse told Everett to bring Gantt to the clinic. When Everett told the other deputies in the control room that she was

taking Gantt to the medical clinic, none of them warned her that "they [were] worried about [Gantt], [or] thought she was one that was more likely to commit suicide," even though the deputies regularly "rely on each other . . . for information . . . about particular inmates." And in Everett's view, Gantt's request for help was "a sure sign that [Gantt] want[ed] help not to harm herself any further." Everett yelled for another deputy to grab a uniform for Gantt and unlocked Gantt's cell door from the control room. There were no deputies in the A Block when Everett unlocked Gantt's cell.

After her cell door unlocked, Gantt ran out of her cell, across the day space, and up the stairs leading to the second level of the A Block. At this point, Everett had left the control room and returned to the A Block. She saw Gantt run up the stairs and yelled at her to come down. Everett initially "assumed that [Gantt] was just trying to get something from somebody" on the second story because Gantt did not have access to the prison store. But when Gantt reached the top landing and "had her hand on the rail," Everett "knew what she was doing."

Everett ran up the stairs to try to stop Gantt, but she did not reach Gantt before Gantt jumped. Gantt jumped 23 seconds after Everett unlocked her cell door. Gantt was taken to the emergency room, where she was treated for ankle fractures from her jump and for her preexisting head injury.

Gantt sued Everett for violating her rights under the Fourteenth Amendment. *See* 42 U.S.C. § 1983. She alleged that Everett was deliberately indifferent to a strong likelihood that she would

attempt to take her own life and that Everett's deliberate indifference resulted in her suicide attempt and injuries.

After discovery, Everett moved for summary judgment based on qualified immunity. The district court denied the motion. It ruled that a reasonable juror could find that Everett violated Gantt's constitutional rights by "deliberately disregard[ing] a strong likelihood . . . that harm would occur if she let [Gantt] out of her cell unsupervised." It also ruled that Everett violated clearly established law because "the Eleventh Circuit has made clear that an officer's deliberate indifference to the risk of serious harm to a detainee is a violation of the Fourteenth Amendment."

## II. STANDARD OF REVIEW

We "review a denial of qualified immunity *de novo* and, on a motion for summary judgment, view the evidence in the light most favorable to the nonmoving party." *Nelson v. Tompkins*, 89 F.4th 1289, 1295 (11th Cir. 2024).

## III. DISCUSSION

"[Q]ualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Marbury v. Warden*, 936 F.3d 1227, 1232 (11th Cir. 2019) (citation and internal quotation marks omitted). The official invoking qualified immunity has the initial burden to establish that she was acting within her discretionary authority. *Id.* Gantt does not dispute that Everett acted within her discretionary authority.

So Gantt bore the burden to prove that a reasonable jury could find that Everett violated her constitutional right and that her right was clearly established when Everett violated it. *See Nelson*, 89 F.4th at 1296.

Pretrial detainees have a Fourteenth Amendment right "to be protected from self-inflicted injuries, including suicide." *Jackson v. West*, 787 F.3d 1345, 1352 (11th Cir. 2015) (citation omitted). For a prisoner-suicide claim, "the plaintiff must show that the jail official displayed deliberate indifference to the prisoner's taking of his own life." *Id.* at 1353 (emphasis omitted) (citation and internal quotation marks omitted). A deliberate-indifference claim has both an objective and a subjective component: an inmate must prove that she "suffered a deprivation that was, objectively, sufficiently serious" and that the defendant "acted with subjective recklessness as used in the criminal law." *Wade v. McDade*, 106 F.4th 1251, 1262 (11th Cir. 2024) (en banc) (citations and internal quotation marks omitted) (clarifying the standard for establishing liability on an Eighth Amendment deliberate-indifference claim); *see also Tittle v. Jefferson Cnty. Comm'n*, 10 F.3d 1535, 1539 (11th Cir. 1994) (en banc) ("Whether the alleged violation is reviewed under the Eighth or Fourteenth Amendment is immaterial because in a prisoner suicide case . . . under either the [E]ighth or [F]ourteenth [A]mendment, the plaintiff must show that the jail official defendant displayed deliberate indifference to the prisoner's taking of his own life." (alterations adopted) (citation and internal quotation marks omitted)). Subjective recklessness means that "the defendant was actually, subjectively aware that his own conduct caused a substantial risk

of serious harm to the plaintiff." *Wade*, 106 F.4th at 1262. The official's subjective awareness of the risk must be tied to the specific individual whose rights are at issue. *See Tittle*, 10 F.3d at 1539 ("[O]fficials [must] have notice of the suicidal tendency of *the* individual whose rights are at issue in order to be held liable for the suicide of that individual.").

Gantt satisfied the objective requirement of her claim of deliberate indifference. She "suffered a deprivation that was, objectively, sufficiently serious" because she was not prevented from injuring herself by jumping off the stairs. *Wade*, 106 F.4th at 1262 (citation and internal quotation marks omitted). But Gantt failed to establish that Everett was "actually, subjectively aware" that her decision to unlock Gantt's cell from the control room "caused a substantial risk of serious harm" to Gantt based on Gantt's suicidal tendencies. *Id.*

To be sure, Everett knew that suicidal inmates were kept on the bottom floor of the A Block because jumping off the second-story landing is an "obvious suicide" risk, and she knew of two inmates in the general jail population who had jumped from the second-story landing and injured themselves. She agreed that when the cell door was unlocked, that would give Gantt the opportunity to run up the stairs and jump "[i]f she wanted to." And Everett "knew that at some point, [Gantt] had to have told somebody she wanted to kill herself to be on suicide watch."

But there is no evidence in the record from which a reasonable jury could find that when Everett remotely unlocked Gantt's

cell door, Everett was subjectively aware that doing so created a substantial risk that Gantt would climb the stairs and jump. Everett had no prior knowledge about any suicide attempts by Gantt. She testified that suicide attempts are "well-known throughout the jail," and that she "would have heard [Gantt's] name plenty of times if she had done anything." She also testified that when she walked into the control room and told the deputies there that she was about to take Gantt to the medical clinic, "if they [were] worried about [Gantt], [or] thought she was one that was more likely to commit suicide," they would have warned her because the deputies regularly "rely on each other . . . for information . . . about particular inmates." Everett testified, without dispute, that Gantt's request for assistance was, in her view, "a sure sign that [Gantt] want[ed] help not to harm herself any further." And when Everett first saw Gantt climb the stairs, she "assumed that [Gantt] was just trying to get something from somebody" because Gantt did not have access to the prison store as a suicidal inmate. It was not until Gantt "had her hand on the rail" that Everett "knew what she was doing."

We reject the notion that we must view Everett's response to Gantt's suicide risk in isolation from the risk posed by her head injury. Everett perceived that Gantt's head injury created an immediate risk of serious harm for which she was seeking help, and Everett indisputably tried to help her. She approached Gantt's cell upon hearing her cries, relayed her injury to the jail's nurses, and arranged for her transport to the medical clinic. After unlocking Gantt's door from the control room, Everett immediately walked

back to the A Block to take Gantt to the medical clinic. When she realized that Gantt was going to jump, Everett chased after her to try to stop her. Because Everett sought to aid Gantt, we cannot say that she knowingly ignored a substantial risk of harm at the same time.

Perhaps Everett acted negligently in rendering aid. Perhaps she should have ensured that another deputy was in the A Block before unlocking Gantt's cell. Perhaps she could have made her way back to the A Block with greater haste. But the Fourteenth Amendment does not prohibit negligence; it prohibits "subjective recklessness as used in the criminal law." *Wade*, 106 F.4th at 1262 (citation and internal quotation marks omitted). Because Everett was not criminally reckless, she did not violate Gantt's constitutional rights and is entitled to qualified immunity.

## IV. CONCLUSION

We **VACATE** and **REMAND** with instructions to enter summary judgment for Everett based on qualified immunity.

24-12167                 Kidd, J., Dissenting                    1

KIDD, Circuit Judge, dissenting:

This deliberate indifference claim comes with a knotty fact pattern. Deputy Everett had to confront two separate, known risks to Gantt's health and safety. The first risk was the obvious head injury that Everett saw when she observed Gantt in her cell. No one faults Everett for attempting to help Gantt with that medical emergency. But this first risk is not before us, and we must be careful not to allow Everett's response to Gantt's head injury to cloud our review of her response to the second risk: Gantt's known suicidal tendencies. I disagree with the majority's finding that "there is no evidence in the record from which a reasonable jury could find that when Everett remotely unlocked Gantt's cell door, Everett was subjectively aware that doing so created a substantial risk that Gantt would climb the stairs and jump." That conclusion is at odds with the record before us.

The majority and I both begin our deliberate indifference analysis with *Wade v. McDade*, 106 F.4th 1251 (11th Cir. 2024) (en banc). In *Wade*, we held that "a deliberate-indifference plaintiff must show that the defendant acted with 'subjective recklessness as used in the criminal law,' and that in order to do so, the plaintiff must demonstrate that the defendant actually knew that his conduct—his own acts or omissions—put the plaintiff at substantial risk of serious harm." *Id*. at 1253 (citation omitted) (quoting *Farmer v. Brennan*, 511 U.S. 825, 839 (1994)). That is what occurred here.

As the majority recognizes, despite minimal prior interaction between Everett and Gantt, Everett subjectively knew that (1)

Gantt was suicidal and was on suicide watch; (2) suicidal inmates were kept on the bottom floor of the A Block because jumping off the second-story landing is an "obvious suicide" risk; (3) at least two other inmates in the general jail population had jumped from the second-story landing and injured themselves; and (4) remotely unlocking Gantt's door gave Gantt the opportunity to run up the stairs and jump.

What did Everett do with this knowledge? She remotely unlocked Gantt's cell door (knowing that Gantt was on suicide watch), which allowed Gantt to run up the stairs and jump (exactly what Everett knew other inmates had done before). Everett's actions went beyond mere negligence. It does not matter if Everett thought, or if we believe that it was reasonable for Everett to think, that Gantt might not attempt suicide at that moment. Rather, the evidence supports that Everett "[was] aware that [her] conduct might cause the [attempted suicide] result, though it [was] not substantially certain to happen." *Id.* at 1261 (emphasis omitted) (quoting Wayne LaFave, *Substantive Criminal Law* § 5.4(f), at 507 (2018)) (citation modified). That is all "subjective recklessness as used in the criminal law" requires.

In *Wade*, we also added the caveat that, if the defendant "'actually knew of a substantial risk to inmate health or safety,' he 'cannot be found liable . . .' if he 'responded reasonably to th[at] risk.'" *Id.* at 1262 (quoting *Farmer*, 511 U.S. at 844–45). There are several reasonable responses that Everett could have taken in light of Gantt's suicide risk, including, as the majority notes, "ensur[ing]

24-12167                    Kidd, J., Dissenting                    3

that another deputy was in the A Block before unlocking Gantt's cell." That would have allowed Everett to respond reasonably both to Gantt's head injury and to her suicide risk.

What was *not* a reasonable response to Gantt's *suicide risk* was simply unlocking the cell door remotely and providing the opportunity for Gantt to do what Everett knew was possible: a suicide attempt. The majority accurately notes that, *after* unlocking Gantt's cell door, Everett walked back to the cell block and then chased Gantt up the stairs. But that was not a response to Gantt's suicide risk. That was Everett's response to her own misjudgment. Perhaps that response would be persuasive to a jury at trial, but it should not entirely absolve her of liability at this stage through qualified immunity.

We must bear in mind that this case is currently before us on summary judgment. "Where the nonmoving party [here, Gantt] bears the burden of proof at trial, the moving party [here, Everett] may discharge this initial responsibility by showing that there is an absence of evidence to support the nonmoving party's case. If [Everett] makes that showing, [Gantt] must come forward with evidence sufficient to withstand a directed verdict motion." *Bayse v. Ward*, 147 F.4th 1304, 1312 (11th Cir. 2025) (citation modified).

In my view, Gantt has put forth enough evidence for a reasonable jury to find that Everett violated Gantt's constitutional rights under the *Wade* standard. I would therefore affirm the district court, deny Everett qualified immunity, and allow a jury to decide whether Everett should be liable to Gantt.

4                          Kidd, J., Dissenting                    24-12167

I respectfully dissent.